*In re: D.D.*, No. 27, September Term, 2021. Opinion by Biran, J.

**FOURTH AMENDMENT – SEARCHES AND SEIZURES – INVESTIGATORY DETENTIONS – REASONABLE SUSPICION BASED ON THE ODOR OF MARIJUANA** – D.D., a juvenile, and his four companions were detained by police officers after the officers smelled the odor of marijuana coming from the group. While frisking D.D. for weapons, one of the officers discovered a loaded gun in D.D.'s waistband. After being charged with firearms offenses, D.D. moved to suppress the gun. The Court of Appeals held that the odor of marijuana gives rise to reasonable suspicion that criminal activity may be afoot, and thus provides the basis for a brief investigatory detention. Possession of 10 grams or more of marijuana remains a criminal offense in Maryland, and the odor of marijuana, therefore, remains evidence of a crime. Although that odor, without more, does not provide probable cause to arrest a person for a criminal possession of marijuana, it does meet the less stringent standard of reasonable suspicion necessary to justify an investigatory stop. This distinction makes sense, given the differing level of intrusion associated with an arrest compared to an investigative detention. Thus, the Court held that the initial detention of D.D., based solely on the odor of marijuana, did not violate the Fourth Amendment.

**FOURTH AMENDMENT – SEARCHES AND SEIZURES – PAT-DOWN FOR WEAPONS – REASONABLE SUSPICION THAT THE SUSPECT IS ARMED AND DANGEROUS** – The Court of Appeals held that the officer who frisked D.D. had reasonable suspicion that D.D. was armed and dangerous, based on the totality of the circumstances. The factors supporting reasonable suspicion included the evasive behavior and body language of D.D. and his companions, the discovery of what was claimed to be a BB gun on one of the other young men in the group, D.D.'s baggy clothing, the officers' smelling the odor of marijuana, their concern that the group was trespassing, and the fact that the officers were outnumbered five to two.

IN THE COURT OF APPEALS

OF MARYLAND

No. 27

September Term, 2021

IN RE: D.D.

\*Getty, C.J.
\*McDonald
Watts
Hotten
Booth
Biran
Raker, Irma S.
   (Senior Judge, Specially Assigned),

JJ.

Opinion by Biran, J.
Watts, J., concurs.
Hotten and Raker, JJ., dissent.

Filed: June 21, 2022

\*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In 2014, the Maryland General Assembly decriminalized possession of less than 10 grams of marijuana. However, the Legislature did not legalize marijuana possession. Rather, possession of less than 10 grams of marijuana currently is a civil offense punishable by fines and other remedies, and possession of more than 10 grams of marijuana remains a criminal offense.

In the aftermath of this partial decriminalization, this Court has issued several opinions concerning warrantless searches and seizures based on the odor of marijuana. The most recent of these cases, *Lewis v. State*, 470 Md. 1 (2020), involved a search incident to an arrest, where the probable cause for the arrest was based solely on the fact that officers smelled marijuana on the defendant. We held that the odor of marijuana on a person, without more, does not provide probable cause to believe that the person is in possession of a criminal amount of the drug. Therefore, the officers lacked probable cause to arrest the defendant, and the evidence found in the search incident to that arrest had to be suppressed.

In this case, we consider whether to extend the holding in *Lewis* to an investigatory detention, which requires a showing of reasonable suspicion to believe that criminal activity may be afoot – a standard that is significantly less stringent than probable cause. That is, we must decide whether the odor of marijuana, by itself, provides reasonable suspicion to support an investigatory detention.

On November 15, 2019, two police officers stopped a group of five young men as the group was getting ready to leave an apartment building in Capitol Heights, Maryland. D.D., the Respondent/Cross-Petitioner before us, was one of the five members of the group. He was 15 years old at the time. The officers had been called to the building based on a

complaint involving the odor of marijuana. The officers smelled a strong odor of marijuana coming from the group of young men and directed them to sit down, thus seizing them for purposes of the Fourth Amendment. The young men would not tell the officers where they lived, and D.D., in particular, exhibited behavior that one of the officers believed was "evasive," suggesting to the officer that D.D. might be armed. The officers subsequently began patting down the members of the group for weapons. One of the officers found a suspected handgun (possibly a BB gun) in the waistband of one of D.D.'s companions. The other officer then frisked D.D. and found a loaded gun in D.D.'s waistband. A delinquency petition subsequently was filed in the Circuit Court for Prince George's County charging D.D. with firearms offenses.

D.D. moved to suppress the gun, arguing that his initial detention and subsequent frisk both violated the Fourth Amendment. The circuit court, sitting as the juvenile court, denied D.D.'s suppression motion and found him involved as to the charged offenses. D.D. appealed the juvenile court's denial of his suppression motion.

The Court of Special Appeals reversed, holding that the odor of marijuana, without more, does not provide reasonable suspicion of possession of a criminal amount of marijuana. Thus, the intermediate appellate court held that the investigatory detention of D.D., which was based solely on the odor of marijuana, violated the Fourth Amendment. Having ruled that the gun should have been suppressed due to the invalid detention, the Court of Special Appeals did not decide whether the frisk also was impermissible.

We hold that the odor of marijuana provides reasonable suspicion of criminal activity sufficient to conduct a brief investigatory detention. Thus, the officers' initial stop

2

of D.D. did not violate the Fourth Amendment. We also conclude that the discovery of a weapon on one of D.D.'s companions, combined with the group's evasive behavior and other circumstances, provided the officers with reasonable suspicion that D.D. was armed and dangerous. Thus, the pat-down that led to the discovery of the gun on D.D. also was reasonable. Accordingly, we will reverse the judgment of the Court of Special Appeals and hold that the juvenile court properly denied D.D.'s suppression motion.

## I

## Background

### A. The Investigatory Detention and Pat-Down of D.D.

On November 15, 2019, shortly after 7:30 p.m., Sergeant Jeff Walden and Officer Alexandra Moser of the Prince George's County Police Department (the "Department") responded to a call for service to investigate a group of males in an apartment building located at 6626 Ronald Road in Capitol Heights, Maryland. The call was based on a complaint of "loud music and the smell of marijuana" coming from the basement of the building.

After opening the front door of the apartment building, the officers saw a group of five young men walking up the stairs from the basement. The officers "smelled a strong odor of marijuana" coming from the group. Sergeant Walden – a 21-year veteran of the Department – stopped the group and directed them to "have a seat" on the stairs. The young men were wearing baggy clothes, and D.D. was wearing a "big puffy jacket." There were two sets of stairs leading away from the landing where the officers were located when they entered the building and stopped the group. The stairs to the left of the officers led up to

3

the next level of the building. The stairs to the right led down to the basement.[1] After Sergeant Walden told the young men to sit down, four of the members of the group sat down on the ascending staircase. The young man later identified as D.D.[2] was the only member of the group who sat down on the descending staircase.

According to Sergeant Walden, he and Officer Moser began their discussion with the young men by asking, "[W]ho lives here?" The officers received no response. None of the members of the group "could provide any identification of where they lived." When Sergeant Walden specifically asked D.D. where he lived, D.D. "shrugged his shoulders and didn't say anything." When Officer Moser asked D.D. the same question, D.D. replied "my dick." The other members of the group were "snickering, laughing, very carefree, [and] not cooperative." Sergeant Walden noticed that D.D. kept turning away from him and "seemed to be evasive," which, based on Sergeant Walden's "training and knowledge," is "a sign that you could be carrying a weapon." Sergeant Walden also was concerned because he could not "really see [D.D.'s] hands." According to Sergeant Walden, D.D. "would speak to me, but I can't see his whole body language, I can't see what he's doing."

Because of the "odor of marijuana," the group's "evasive body language," and the fact that there were "five of them in baggy clothes" in a place "where they could run out the door," Sergeant Walden was concerned that one of the group members might be in possession of a weapon and "wanted to feel safe that there was nobody that was armed at

---

[1] Although it is not explicit in the record, we infer that it was this set of stairs that the young men were ascending as the officers entered the building.

[2] In this opinion, we refer to D.D. and other juveniles by their initials.

the time." The officers told the group members that they would each be frisked. At that point, the officers were investigating the young men for the crimes of trespassing and possession of controlled dangerous substances.

Officer Moser first conducted a pat-down of one of D.D.'s companions. As she did so, Officer Moser felt what she believed to be a handgun inside the waistband of the subject's pants. Officer Moser then placed the young man in handcuffs. At that point, Sergeant Walden moved to assist Officer Moser and stood in front of the door because "through [his] training and knowledge and understanding" he "knew as soon as she put him in handcuffs that she had recovered a weapon." After she placed the young man in handcuffs, Officer Moser conducted a more thorough pat-down and removed the suspected handgun from the subject's waistband.

After securing the group member with the suspected handgun and placing him to the side, Sergeant Walden turned his attention to D.D. Sergeant Walden "had [D.D.] stand up, place his hands on top of his head and … step against the wall." Sergeant Walden then "started a pat-down … and as soon as [he] went to the waistband, which is the first place that [he] went, [he] could feel the butt of a handgun in his waistband." Sergeant Walden then placed D.D. in handcuffs "so he wouldn't be able to reach for it or fight or anything." From D.D.'s waistband, Sergeant Walden retrieved a loaded nine millimeter handgun.

When asked to explain "how officers are trained to respond when they're outnumbered," Sergeant Walden responded:

> At first you're in a terrible disadvantage. We were taught in the academy, it's basic, you'd want to also go with back-up and you shouldn't handle any call by yourself.

5

But there are times where you're put in that position to where there are several people coming at you, so you have to get the advantage. And one of the first concerns is a weapon that they could use against you.

And my first concern was one of them having a weapon. And there was five of them and they were right by a door where they could run out the door, plus the odor … of marijuana, that there was illegal drug activity there, the fact that nobody could provide any identification that they live inside that building.

So the first thing we want to do is secure them and make sure that they don't have any weapons on them. Once we found the weapon on them, then they were secured and handcuffed.

## B. The Juvenile Court's Ruling

On November 18, 2019, a delinquency petition was filed in the Circuit Court for Prince George's County charging D.D. with possession of a regulated firearm by a person under the age of 21 and two other firearms-related offenses. On December 13, 2019, D.D., through counsel, filed a motion to suppress the handgun recovered from his waistband. The circuit court, sitting as the juvenile court, held a hearing on D.D.'s motion on December 17, 2019. The State called one witness, Sergeant Walden, who testified to the facts set forth above.

D.D. called one witness, D.A., another juvenile who was in the group of five. D.A. testified that, after he and the others encountered the officers as they walked up the stairs from the basement, the officers immediately told them to sit down. According to D.A., the "first thing they asked was does anybody have dope, where's the dope." The group responded that they had no drugs. The male officer then asked them if there was anything they wanted to tell him about. The group said that there was not, but D.A. told the officer

6

that he had a "funnel" on him, which was "not a drug."[3] After that, according to D.A., the officers "were like okay, we're going to search everybody." D.A. acknowledged that he and the others had been smoking marijuana in the basement prior to their encounter with the officers. D.A. also stated that none of the five young men lived in the building and confirmed that, after the female officer frisked one of the other young men, "J.", she removed a weapon from J.'s waistband. According to D.A., after the female officer felt the weapon, J. "called out" that he had a BB gun. D.A. confirmed that the female officer discovered the alleged BB gun on J. before the male officer began frisking D.D.

After hearing argument from counsel for D.D. and the State, the juvenile court denied D.D.'s suppression motion:

> The Court finds there's … reasonable articulable suspicion that the Respondent was engaged in criminal activity, a lot of facts as they were outlined in the testimony, it was … 7:00 in November…. It was … cold. That there was a strong odor of marijuana. The Court credits the testimony of the officer regarding the response from some of the males in response to his questions, that the young man was evasive. The Court also credits the officer's testimony … that he asked where he lived and the, they responded, replied, you know, at my dick. So the Court finds there's a reasonable articulable suspicion for criminal activity. The Court is going to deny the motion to suppress.

(Paragraph breaks omitted.)

On January 7, 2020, the juvenile court found that D.D. was involved as to all counts charged in the delinquency petition. After holding a disposition hearing on February 7,

---

[3] D.A. did not provide any further explanation about what a "funnel" is. In its brief, the State tells us that "it appears [D.A.] was referring to a tobacco leaf product used for rolling cigarettes."

2020, the juvenile court ordered D.D. placed on probation/protective supervision with probation to be terminated on November 30, 2020.

## C. Appeal

The Court of Special Appeals reversed the juvenile court's denial of D.D.'s suppression motion. *In re D.D.*, 250 Md. App. 284 (2021). Although the Court of Special Appeals acknowledged that this Court's opinion in *Lewis* "addressed probable cause, a higher standard than reasonable suspicion," it observed that reasonable suspicion "still is tied to suspicion of *criminal* conduct." *Id.* at 300-01. The intermediate appellate court concluded that "because the 'odor of marijuana alone does not indicate the quantity, if any, of marijuana in someone's possession,' *Lewis*, 470 Md. at 27, it cannot, by itself, provide reasonable suspicion that the person is in possession of a criminal amount of marijuana or otherwise involved in criminal activity." *Id.* at 301. Because the officers detained D.D. and his companions based solely on the odor of marijuana, the Court of Special Appeals held that the officers lacked reasonable suspicion for the stop. *Id.* Accordingly, the Court concluded that the seizure was unreasonable under the Fourth Amendment and that the juvenile court erred in denying D.D.'s suppression motion. *Id.* Having concluded that suppression of the gun was required due to the unconstitutionality of the initial detention, the Court of Special Appeals did not decide whether the subsequent frisk of D.D. independently violated the Fourth Amendment.

The State filed a petition for *certiorari* in this Court, seeking review of the following question: "Does the scent of marijuana provide reasonable suspicion to conduct an investigatory stop to determine if someone possesses a criminal amount of marijuana or

could be cited for civil violations of marijuana laws?" D.D. subsequently filed a conditional cross-petition presenting the question: "Assuming, *arguendo*, that the stop was constitutional, was the frisk unlawful because the police lacked reasonable suspicion to believe that D.D. was armed and dangerous?" We granted both petitions. *In re D.D.*, 475 Md. 701 (2021).

## II

## Standard of Review

In reviewing a trial court's ruling concerning the admissibility of evidence allegedly seized in violation of the Fourth Amendment, we accept the trial court's findings of fact unless they are clearly erroneous. *Grant v. State*, 449 Md. 1, 31 (2016). We independently appraise the ultimate question of constitutionality by applying the relevant law to the facts *de novo*. *See id.*

Where "there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." *Givens v. State*, 459 Md. 694, 705 (2018) (internal quotation marks and citation omitted). We review "the trial court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the party who prevails on the issue that the defendant raises in the motion to suppress." *Robinson v. State*, 451 Md. 94, 108 (2017) (citation omitted).

# III

## Discussion

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Under the Fourth Amendment, "subject only to a few specifically established and well-delineated exceptions, a warrantless search or seizure that infringes upon the protected interests of an individual is presumptively unreasonable." *Grant*, 449 Md. at 16-17 (footnote omitted). "The default rule requires that a seizure of a person by a law enforcement officer must be supported by probable cause, and, absent a showing of probable cause, the seizure violates the Fourth Amendment." *Crosby v. State*, 408 Md. 490, 505 (2009) (citation omitted). However, "a law enforcement officer may conduct a brief investigative 'stop' of an individual if the officer has a reasonable suspicion that criminal activity is afoot." *Id.* at 505-06 (quoting *Terry v. Ohio*, 392 U.S. 1, 17 (1968)). In addition, a police officer may conduct "a reasonable search for weapons for the protection of the police officer, where [the officer] has reason to believe that [the officer] is dealing with an armed and dangerous individual, regardless of whether he [or she] has probable cause to arrest the individual for a crime." *In re David S.*, 367 Md. 523, 533 (2002) (quoting *Terry*, 392 U.S. at 27).

10

**A. Reasonable Suspicion and the Odor of Marijuana**

D.D. argues that this Court's opinion in *Lewis v. State* is dispositive of the first issue presented by this case. D.D.'s position is that "[b]ecause the odor of marijuana alone is not indicative of criminal activity and an officer must have evidence of a crime in order to conduct an investigatory stop, it necessarily follows that the odor of marijuana alone does not provide reasonable suspicion to conduct a *Terry* stop."

The State argues that the Court of Special Appeals erred when it held that the odor of marijuana "cannot, by itself, provide reasonable suspicion that the person is in possession of a criminal amount of marijuana or otherwise involved in criminal activity." *D.D.*, 250 Md. App. at 301. The State emphasizes that the standard for reasonable suspicion is less demanding than that for probable cause. Thus, according to the State, the Court of Special Appeals' decision in this case improperly "elevates the standard for reasonable suspicion, requiring police at the nascent stage of an investigation to have certainty that criminal activity is afoot before being able to conduct an investigatory stop meant to confirm or dispel that suspicion." We agree with the State.

1. The Odor of Marijuana and Probable Cause

Prior to the General Assembly's partial decriminalization of marijuana possession in 2014, possession of any amount of marijuana generally was illegal.[4] As a result, before 2014, the odor of marijuana gave law enforcement officers probable cause to search a vehicle, *see, e.g.*, *Wilson v. State*, 174 Md. App. 434, 441-42 (2007), and the odor of

---

[4] Maryland adopted a medical marijuana program in 2013. *See* H.B. 1101, 2013 Leg., 433rd Sess. (Md. 2013).

marijuana particularized to a person provided probable cause for an arrest. *See McGurk v. State*, 201 Md. App. 23, 52 (2011) (citation omitted).

Currently, the use or possession of less than 10 grams of marijuana is a "civil offense" punishable by a fine not exceeding $100 for a first offense, increasing to a fine of $250 for a second offense, and $500 for a third or subsequent offense. Md. Code Ann., Crim. Law (CR) § 5-601(c)(2)(ii) (2002, 2021 Repl. Vol.). Smoking marijuana in a public place is a civil offense punishable by a fine not exceeding $500. *Id.* § 5-601(c)(4). The "use or possession" of 10 grams or more of marijuana remains a criminal offense, specifically a misdemeanor punishable by imprisonment not exceeding six months or a fine not exceeding $1,000, or both. *Id.* § 5-601(c)(2).[5]

The partial decriminalization of marijuana changed the legal landscape significantly, leading to a series of decisions by the Court of Special Appeals and this Court that considered whether and how the odor of marijuana continues to provide probable cause to conduct warrantless searches and seizures in Maryland.

The first of these cases was *Bowling v. State*, 227 Md. App. 460 (2016). *Bowling* involved a traffic stop that subsequently resulted in a K-9 alert indicating that the vehicle contained a controlled dangerous substance. *Id*. at 462-65. As such, the case dealt with the automobile exception to the warrant requirement, also known as the "*Carroll* doctrine," which allows an officer to "search an automobile, without a warrant, if he or she has

---

[5] The General Assembly has provided exceptions to this enforcement regime for those who have obtained marijuana "directly or by prescription or order from an authorized provider acting in the course of professional practice." CR § 5-601(a)(1).

probable cause to believe it contains evidence of a crime or contraband goods." *Id*. at 468

(citing *Carroll v. United States*, 267 U.S. 132 (1925); *Wyoming v. Houghton*, 526 U.S. 295,

300 (1999)). The Court of Special Appeals noted that "Maryland appellate courts

consistently have held that the detection of the odor of marijuana by a trained drug dog

establishes probable cause to conduct a warrantless *Carroll* doctrine search of a vehicle,"

before going on to consider "whether the recent Maryland law, which decriminalized the

possession of less than 10 grams of marijuana and made it a civil offense, changes this

analysis." *Id*. at 469 (citations omitted).

The Court of Special Appeals held that the partial decriminalization did "not change

the established precedent that a drug dog's alert to the odor of marijuana, without more,

provides the police with probable cause to authorize a search of a vehicle pursuant to the

*Carroll* doctrine." *Id*. at 476. Important to the intermediate appellate court's holding was

the fact that "although the Maryland General Assembly made possession of less than

10 grams of marijuana a civil, as opposed to a criminal, offense, it is still illegal to possess

any quantity of marijuana, and marijuana retains its status as contraband." *Id*.

*Robinson v. State*, 451 Md. 94 (2017), also concerned the automobile exception to

the warrant requirement, but involved the smell of marijuana by an officer, not a drug dog.

In *Robinson*, this Court analyzed the "Fourth Amendment jurisprudence of the Supreme

Court, *Bowling*, and authority from other jurisdictions that have addressed the

decriminalization – or, in one instance, the legalization – of marijuana," and held that "a

law enforcement officer has probable cause to search a vehicle where the law enforcement

officer detects an odor of marijuana emanating from the vehicle." *Id*. at 125. Similar to

13

*Bowling*, our holding in *Robinson* was based largely on the idea that "[d]ecriminalization is not the same as legalization" and that "[d]espite the decriminalization of possession of less than ten grams of marijuana, possession of marijuana in **any** amount remains illegal in Maryland." *Id.* (emphasis in original). We further explained:

> [A]t oral argument and in its brief, the State argued that, separate from the odor of marijuana providing probable cause to believe that a vehicle contains contraband, the odor of marijuana provides probable cause to believe that a vehicle contains evidence of a crime. Put simply, we agree. Despite the decriminalization of possession of less than ten grams of marijuana, the odor of marijuana remains evidence of a crime. The odor of marijuana emanating from a vehicle may be just as indicative of crimes such as the possession of more than ten grams of marijuana, possession of marijuana with the intent to distribute, or the operation of a vehicle under the influence of a controlled dangerous substance, as it is of possession of less than ten grams of marijuana…. [I]t is unreasonable to expect law enforcement officers to determine, based on odor alone, the difference between 9.99 grams or less of marijuana and 10 grams of marijuana. In short, possession of ten grams or more of marijuana, crimes involving the distribution of marijuana, and driving under the influence of a controlled dangerous substance have not been decriminalized in Maryland, and, thus, the odor of marijuana emanating from a vehicle provides probable cause to believe that the vehicle contains evidence of a crime, and a law enforcement officer may search the vehicle under such circumstances.

*Id.* at 133-34.

Just a few months later, in *Norman v. State*, 452 Md. 373 (2017), we considered whether the odor of marijuana emanating from a vehicle with multiple passengers alone could serve as "reasonable articulable suspicion that the vehicle's occupants are armed and dangerous and subject to frisk." *Id.* at 412. We answered that question in the negative, reasoning that

> for a law enforcement officer to frisk, *i.e.*, pat down, an individual, there must be reasonable articulable suspicion that the individual is armed and dangerous, even where a law enforcement officer detects the odor of

14

marijuana emanating from a vehicle. We hold that, where an odor of marijuana emanates from a vehicle with multiple occupants, a law enforcement officer may frisk an occupant of the vehicle if an additional circumstance or circumstances give rise to reasonable articulable suspicion that the occupant is armed and dangerous. Stated otherwise, for a law enforcement officer to have reasonable articulable suspicion to frisk one of multiple occupants of a vehicle from which an odor of marijuana is emanating, the totality of circumstances must indicate that the occupant in question is armed and dangerous.

*Id.* at 411-12. Thus, while the smell of marijuana can justify a quick pat-down of a vehicle's occupants if combined with some other pertinent circumstance(s), the odor, in and of itself, is insufficient to give rise to reasonable suspicion that a specific individual within the vehicle is armed and dangerous. *Id.* at 412. The Court stated that *Robinson* was not "determinative of the issue at hand," *id.* at 409, as "[n]o frisks or searches of persons were at issue in *Robinson*, and nowhere in *Robinson* did this Court imply, one way or the other, whether a frisk of a person would be permissible based on an odor of marijuana alone emanating from a vehicle." *Id.* at 411.

Next, in *Pacheco v. State*, 465 Md. 311 (2019), we considered whether the smell of marijuana in a car, combined with the observation of a "fresh burnt" joint that could not possibly have contained more than 10 grams of marijuana, provided probable cause sufficient both to search the car and to arrest, and thereby search, the occupant of the car. Although we indicated that "the police lawfully searched Mr. Pacheco's car for contraband or evidence of the three crimes identified in *Robinson*," we observed that it "does not follow" from the existence of probable cause to search the car that the police "likewise had the right to search [Pacheco's] person." *Id.* at 330. We explained that "[t]he same facts and circumstances that justify a search of an automobile do not necessarily justify an arrest and

15

search incident thereto. This is based on the heightened expectation of privacy one enjoys in his or her person as compared to the diminished expectation of privacy one has in an automobile. The arrest and search of Mr. Pacheco was unreasonable because nothing in the record suggests that possession of a joint and the odor of burnt marijuana gave the police probable cause to believe he was in possession of a criminal amount of that substance." *Id.* at 333-34. Although we noted that, "[i]n a different case, additional facts or testimony beyond what we have here may well have compelled a different result," we concluded that the State had not met its burden to prove that the warrantless arrest and search of the occupant was reasonable. *Id.* at 333.

Finally, in *Lewis v. State*, we held that the odor of marijuana on a person, without more, does not provide probable cause to arrest the person (and to conduct a search of the person incident to the arrest). In *Lewis*, the State based its argument on the fact that, unlike *Pacheco*, where the police saw a singular marijuana joint in the car that was suggestive of a non-criminal offense, the police in *Lewis* only had the odor of marijuana to go on in deciding whether to arrest the suspect:

> [W]hile the scent of marijuana left unexplained provides probable cause to believe that a criminal amount may be present, see *Robinson*, that scent plus the sighting of a non-criminal amount should diminish suspicion. And without some other factual basis to conclude that, where there is some marijuana, there may be more, the inference of criminal possession in *Pacheco* simply receded into the constitutionally unreasonable.
>
> *Pacheco* is, therefore, best understood as a case-specific application of the totality-of-the-evidence test, and the facts here are different than in *Pacheco*. This case does not feature a fact, akin to the less-than-10-gram-cigarette, that explained the source of the marijuana emanating from Lewis's person in a

16

way that should have diminished Officer Burch's probable cause arising from the scent alone.

Brief of Respondent, *Lewis v. State*, 2019 WL 8014537, at \*47-\*48 (Dec. 10, 2019).

We rejected the State's attempt to distinguish *Pacheco*, and held that the search of Lewis incident to his arrest, based solely on the odor of marijuana emanating from his person, was unreasonable. *Lewis*, 470 Md. at 27. "Under *Pacheco*, that information fell short of supplying the requisite probable cause to conduct that search." *Id.* (citing *Pacheco*, 465 Md. at 333-34). We further explained:

> Probable cause to conduct a lawful arrest requires that the arrestee committed a felony or was committing a felony or misdemeanor in a law enforcement officer's presence. Possession of less than ten grams of marijuana is a civil offense, not a felony or a misdemeanor, therefore law enforcement officers need probable cause to believe the arrestee is in possession of a criminal amount of marijuana to conduct a lawful arrest. The odor of marijuana alone does not indicate the quantity, if any, of marijuana in someone's possession.

*Id.* Thus, we held that for the arrest and search of a person "to be supported by probable cause, the police must possess information indicating possession of a criminal amount of marijuana." *Id.* Because there was no indication in the record suggesting that Lewis possessed a criminal amount of marijuana, we held that his arrest and search incident to arrest violated the Fourth Amendment. *Id.*

2. <u>A Less Stringent Standard: Reasonable Suspicion Versus Probable Cause as Applied to the Odor of Marijuana following Decriminalization</u>

*Lewis* does not necessarily control this case because the initial seizure at issue here (unlike in *Lewis*) is not an arrest requiring probable cause, but rather is an investigatory detention requiring reasonable suspicion. While investigatory detentions are seizures within the meaning of the Fourth Amendment, "the limited nature of a brief investigative

17

stop does not demand a standard as stringent as probable cause." *Crosby*, 408 Md. at 506 (citation omitted). Rather, to conduct a brief investigatory detention, an officer must have only reasonable, articulable suspicion that criminal activity may be afoot. *Id.* at 505-06.

"Reasonable suspicion exists somewhere between unparticularized suspicions and probable cause." *Sizer v. State*, 456 Md. 350, 364 (2017) (citation omitted); *see also Stokes v. State*, 362 Md. 407, 415 (2001) ("[M]ere hunches are insufficient to justify an investigatory stop; for such an intrusion, an officer must have reasonable articulable suspicion.") (internal quotation marks and citations omitted). "While there is no litmus test to define the reasonable suspicion standard," law enforcement officers must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (internal quotation marks and citations omitted); *see also Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (reasonable suspicion means "a particularized and objective basis for suspecting the particular person stopped of breaking the law") (internal quotation marks and citation omitted). We have explained that "the level of suspicion necessary to constitute reasonable, articulable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence and obviously less demanding than that for probable cause." *Graham v. State*, 325 Md. 398, 408 (1992) (internal quotation marks and citations omitted).

The probable cause standard does not require an officer "to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). The same is true, of course, for the reasonable suspicion standard. *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 277 (2002). But, as discussed above, the two

18

standards are not equivalent. Reasonable suspicion is a less stringent standard than probable cause. That is true "not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990).

Put simply, a particular circumstance or set of circumstances may satisfy the reasonable suspicion standard but fall short of probable cause. That is precisely the case with respect to the odor of marijuana. Contrary to D.D.'s argument, decriminalization has not rendered the odor of marijuana free of all criminal suspicion. Rather, "the odor of marijuana remains evidence of a crime," *Robinson*, 451 Md. at 133, because the use or possession of 10 grams or more of marijuana remains a criminal offense in Maryland. In other words, partial decriminalization has reduced the level of certainty associated with the odor of marijuana on a person from probable cause that the person has committed a crime to reasonable suspicion that the person has committed a crime or is in the process of committing a crime.[6]

---

[6] During the 2022 Legislative Session, the General Assembly passed House Bills 1 and 837. House Bill 1 proposes an amendment to the Maryland Constitution legalizing the use and possession of cannabis for individuals in Maryland who are at least 21 years old. The proposed amendment will be on the ballot as part of the 2022 general election. If Maryland voters ratify the constitutional amendment, the voting results will be sent to the Governor and, upon his proclamation, the amendment will take immediate effect. However, the amendment is contingent on the requirement that the General Assembly pass legislation regarding the use, distribution, possession, regulation, and taxation of cannabis. Dep't Legis. Servs., Fiscal and Policy Note, House Bill 837, at 2 (2022 Session), available at https://perma.cc/3R3S-9XMH. House Bill 837, among other things, addresses the use of

It follows that a brief investigatory detention based solely on the odor of marijuana is reasonable, whereas an arrest (and a search incident to such arrest) is unreasonable if based solely on the odor of marijuana. The different outcomes make sense, given the differing levels of intrusiveness of the two Fourth Amendment events. An arrest is the "most intrusive encounter" that a police officer has with a citizen. *Swift v. State*, 393 Md. 139, 150 (2006); *see also State v. Wells*, 859 N.W.2d 316, 326 (Neb. 2015) (observing that an arrest "involves a highly intrusive or lengthy search or detention"). "[G]enerally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest." *Longshore v. State*, 399 Md. 486, 502 (2007). An investigatory detention to determine whether criminal activity is afoot "is less intrusive than a formal custodial arrest[.]" *Swift*, 393 Md. at 150. It "is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions." *Id.*

---

cannabis. Under House Bill 837, persons who are 21 years old or older would be able legally to possess up to 1.5 ounces of usable cannabis (defined in the legislation as the "personal use amount"). The use or possession of more than 1.5 ounces but not more than 2.5 ounces of usable cannabis (defined as the "civil use amount") would be a civil offense punishable by a fine and other remedies. The use or possession of more than 2.5 ounces of usable cannabis (like 10 or more grams under current law) would be a misdemeanor punishable by up to six months of imprisonment, a fine of $1,000, or both. If the constitutional amendment is ratified, additional legislation will be needed to address the remaining outstanding issues. *See* Madeleine O'Neill, *Still on Different Paths: Md. House, Senate disconnected on path to legal cannabis in advance of referendum*, The Daily Record at 1 (June 6, 2022), available at https://perma.cc/F3VJ-CYVK.

We express no opinion concerning the potential impact of the adoption of the proposed constitutional amendment and the provisions of House Bill 837 on this Court's Fourth Amendment jurisprudence.

As to an investigatory detention based on the odor of marijuana, if the officer does not quickly obtain additional information that provides probable cause to believe that the person has committed a violation of CR § 5-601(c)(2) or another criminal offense, the officer must allow the person to go on their way. The public interest in investigating and prosecuting criminal offenses, balanced against an individual's freedom of movement and reasonable expectation of privacy in their person, leads us to conclude that the odor of marijuana by itself justifies a brief investigatory detention, but (as we held in *Lewis*) not an arrest. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) (observing that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion") (internal quotation marks and citation omitted). Thus, if a police officer stops a person based on the smell of marijuana, the officer must "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly[.]" *Id.* at 686 (citations omitted). There is no particular amount of time that is *per se* reasonable or unreasonable. Whether an investigative detention that begins as reasonable based on the odor of marijuana becomes unreasonable because of its length will depend on the particular circumstances of each case. However, we emphasize that such detentions must be brief, especially in light of the reality that many individuals who choose to possess marijuana do so under the criminal threshold of 10 grams.

The Court of Special Appeals reversed the juvenile court's suppression ruling because it believed *Lewis* required that outcome. Although the intermediate appellate court acknowledged that "*Lewis* addressed probable cause, a higher standard than reasonable

21

suspicion," *D.D.*, 250 Md. App. at 300, it reasoned that *Lewis*'s holding rendered D.D.'s investigatory detention unconstitutional "because an officer cannot tell by the smell of marijuana alone that a person is involved in criminal activity." *Id.* at 301.

However, *Lewis* must be read in conjunction with the cases that came before it, including *Robinson*. In *Robinson*, we acknowledged that the odor of marijuana does not reveal the quantity of marijuana held by a given individual. Yet, we recognized that such uncertainty does not render the odor of marijuana irrelevant to a criminal investigation. To the contrary, we stated that, "[d]espite the decriminalization of possession of less than ten grams of marijuana, the odor of marijuana remains evidence of a crime." *Robinson*, 451 Md. at 133.

Notably, in *Pacheco* and *Lewis*, we did not call this language in *Robinson* into question. Indeed, in *Pacheco*, we reaffirmed the holding of *Robinson*, explaining that "the police lawfully searched Mr. Pacheco's car for contraband or *evidence of the three crimes identified in Robinson*[.]" *Pacheco*, 465 Md. at 330 (emphasis added). However, we drew a distinction between the showing necessary to establish probable cause to justify an arrest and the showing necessary to demonstrate probable cause to search an automobile, given the different expectations of privacy that apply in those settings. *See id.* at 333. We further elaborated on this distinction in *Lewis*, citing the "evidence of a crime" language from *Robinson* and stating that "[a]rresting and searching a person, without a warrant and based exclusively on the odor of marijuana on that person's body or breath, is unreasonable and does violence to the fundamental privacy expectation in one's body; the same concerns do not attend the search of a vehicle." *Lewis*, 470 Md. at 26.

22

D.D. contends that "cases discuss[ing] how the odor of marijuana provides probable cause to search a vehicle ... for reasons this Court explained in *Lewis*, are not instructive here." We disagree. In order to accept this proposition, we would need to disclaim *Robinson*'s key language quoted above, which we are not prepared to do. There can be no real dispute that the odor of marijuana still provides evidence of a crime – as we explained in *Robinson* – even if it may not rise to the level of probable cause in every situation.

D.D. correctly observes that there are many wholly innocent reasons why someone might smell of marijuana. However, that does not render the odor of marijuana free of reasonable suspicion. As *Terry* itself demonstrates, wholly innocent conduct may provide reasonable suspicion that criminal activity is occurring or is about to occur.[7] In sum, although the quantum of evidence that the odor of marijuana provides is insufficient to justify an arrest based on the probable cause standard, it meets the reasonable suspicion standard necessary to justify a brief investigatory detention. Put another way, under *Lewis*,

---

[7] In *Terry*, a police officer saw what he reasonably believed to be three men planning a daytime store robbery. However, each individual action that the officer observed was wholly innocent. *See Terry*, 392 U.S. at 5-7. Two of the men walked up and down a street in downtown Cleveland separately several times, repeatedly looking into the same store window. *Id.* at 6. They also spoke with each other and then with the third man. The third man then walked away from the two others. *Id.* The first two men then resumed their "measured pacing, peering and conferring." *Id.* Later, the two men met up with the third man down the street and the group again conversed. *Id.* Based on the officer's observations of this facially innocent conduct, which indicated to the officer that the men were "casing a job, a stick-up," the officer seized Terry and frisked him. *Id.* at 6-7. The Supreme Court upheld the frisk, concluding that the officer's suspicion that Terry might be armed and dangerous, based on this wholly innocent conduct, was reasonable. *See id.* at 27-28. The suspects' actions were consistent with planning a daytime robbery, and nothing the officer observed lessened that suspicion. *Id.* at 28.

the officers could not have arrested D.D. or any of the members of the group based solely on the odor of marijuana, but that does not mean the officers' suspicion that one or more of the group might possess at least 10 grams of the drug – based on odor alone – was unreasonable.[8]

The distinction in the standards applied in these situations exists, in large part, because a brief investigatory stop does not raise "the same concerns" as "[a]rresting and searching a person, without a warrant." *Lewis*, 470 Md at 26. Being stopped for a short amount of time so that an officer can ask a few questions does not do the same "violence to the fundamental privacy expectation in one's body" that being placed in handcuffs and physically searched does. *Id.* Indeed, it would be peculiar if the odor of marijuana was sufficient to meet the higher standard of probable cause needed to search a vehicle, but insufficient to meet the lower standard of reasonable suspicion needed to briefly stop a person on the street. This Court did not contemplate such an incongruous result in deciding *Robinson*, *Pacheco*, and *Lewis*.

Extending *Lewis*'s holding to *Terry* stops also would be problematic because of its implications for investigating crimes besides possession of marijuana. In its principal brief, the State provides several examples:

> For instance, … it would be impossible for an officer who sees the butt of a handgun protruding from a person's waistband to conduct an investigatory stop. Just as the odor of marijuana alone cannot tell an officer

---

[8] D.D. did not argue in the juvenile court that the stop was improper because the officers could not particularize the odor of marijuana to him. He made that argument in the Court of Special Appeals, but the Court held that the argument was not preserved and declined to consider it. *See D.D.*, 250 Md. App. at 298. D.D. has not renewed that argument before us, and therefore we also do not consider it.

whether a person possesses a criminal amount of the drug, an officer's visual inspection of a handgun cannot definitively say whether the person may legally possess the firearm. *See* Crim. Law § 4-101(b) (describing individuals who may lawfully carry a weapon). If no definitive criminal activity is afoot, no investigatory stop would be permitted.

The same logic undermines the rationale for any number of stops. Consider, for example, a traffic stop for excessive window tinting, which the intermediate appellate court considered in *Baez v. State*, 238 Md. App. 587 (2018). There, the court concluded that an officer had reasonable suspicion to make an investigatory stop based on the window tint of a vehicle potentially being in violation of the law. *Id.* at 597. Because an officer's visual inspection of a tinted widow cannot definitively tell whether the tint exceeds the legal limit, no investigatory stop would be permitted, and enforcement of that law would necessarily be stymied. The same holds true for many similar traffic violations.

Taken to extremes, this reasoning could apply to nearly any potential criminal behavior. People die of natural causes every day. A person standing over a dead body, therefore, is probably more likely to have witnessed the person have a fatal heart attack as to have killed the person. Because police cannot immediately tell whether the witness has committed a criminal act or come to the aid of the seemingly stricken, an investigatory stop would be out of the question. Only after police determine that the death was a killing could they seek to hold the witness. These examples, made possible by the reasoning below, turn the constitutional inquiry on its head, mistakenly asking whether "particular conduct is 'innocent' or 'guilty,'" instead of probing the "the degree of suspicion that attaches to particular types of noncriminal acts." *Wesby*, 138 S. Ct. at 588.

D.D. attempts to distinguish his case from the State's examples by asserting that "[t]he key facts in all of [the State's] proposed hypotheticals – butts of handguns, window tints, and dead bodies on the ground – include concrete observations made by the officer that support further investigation. After *Lewis*, the odor of marijuana alone does not provide that same type of concrete information that allows an officer to reasonably infer that an individual is engaged in criminal activity."

25

D.D.'s argument is unconvincing. An officer's detection of the odor of marijuana is also a "concrete observation" that supports further investigation. *See Bailey v. State*, 412 Md. 349, 379 (2010) (noting marijuana's "readily identifiable, distinctive odor"); *State v. Secrist*, 589 N.W.2d 387, 391 (Wis. 1999) (referring to the "unmistakable odor of marijuana").

We agree with the State that accepting D.D.'s argument could significantly hamper the legitimate investigation of criminal activity in Maryland. As stated above, law enforcement officers do not need to rule out innocent explanations for suspicious conduct before conducting a *Terry* stop. Given the important governmental interest in detecting, preventing, and prosecuting crime, the Fourth Amendment allows a brief seizure, based on reasonable suspicion, to attempt to determine whether criminal activity is afoot. An officer who lacks probable cause to arrest is not required "to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972) (citation omitted). When a police officer smells marijuana on someone, it is certainly the case that the person may possess less than 10 grams of marijuana or they may possess no marijuana at all. But it also is possible that the person is presently in possession of 10 or more grams of marijuana. Under D.D.'s reasoning, police officers would be powerless to conduct a brief investigatory detention to try to determine which category the person is in. That is not what the Fourth Amendment requires. To the contrary, the odor of marijuana

permits an officer to briefly detain an individual to investigate whether that person has committed a criminal offense.[9]

Our conclusion differentiating between reasonable suspicion and probable cause with respect to the odor of marijuana is consistent with the rationales of cases from several other jurisdictions concerning the odor of marijuana in a post-decriminalization context. *See, e.g.*, *People v. Looby*, 68 V.I. 683, 697-98 (2018) ("[A]lthough a person in possession of an ounce or less of marijuana may now avoid criminal penalization, the presence or absence of criminal penalization does not disturb our constitutional frisk and seizure inquiry. This is because reasonable suspicion – the predicate for a valid stop and frisk – does not depend on whether the People proved beyond a reasonable doubt that a defendant is 'guilty'; instead, reasonable suspicion is a matter of constitutional and evidentiary concern turning on whether an officer reasonably concludes that evidence of contraband or of a crime may be present…. [T]he scent of marijuana (which remains contraband subject to seizure in this Territory) alone may be sufficient to establish reasonable suspicion or even 'probable cause' to conduct further investigation into possible criminal acts or evidence of contraband."); *In re O.S.*, 112 N.E.3d 621, 634 (Ill. App. Ct. 2018) (concluding "that case law holding that the odor of marijuana is indicative of criminal activity remains

---

[9] The State also argues that, if an officer smells the odor of marijuana on a person, the officer is permitted to briefly detain the person to investigate whether the person is in possession of a quantity of marijuana that would subject the person to a civil penalty, *i.e.*, less than 10 grams. Because we conclude that the odor of marijuana provides reasonable suspicion of a criminal offense, thereby justifying the investigatory detention that occurred in this case, we need not address the State's alternative argument concerning investigation and enforcement of the civil penalties under CR § 5-601(c)(2)(ii).

viable notwithstanding the recent decriminalization of the possession of not more than 10 grams of marijuana" and "find[ing] that the search and seizure of respondent did not run afoul of the fourth amendment"; "Given that Illinois prohibits the knowing possession of marijuana and prohibits operating a vehicle while impaired and under the influence of marijuana, the distinctive odor of marijuana was indicative of criminal activity and provided the officers with reasonable suspicion to believe that criminal activity was afoot."); *People v. Zuniga*, 372 P.3d 1052, 1059 (Colo. 2016) (although state law permits possession of an ounce or less of marijuana, because other marijuana-related activities remain unlawful, "the odor of marijuana is still suggestive of criminal activity"); *State v. Senna*, 79 A.3d 45, 50-51 (Vt. 2013) (medical marijuana exemption from prosecution for marijuana possession "does not undermine the significance of the smell of marijuana as an indicator of criminal activity").

To be sure, courts in several other states have held or suggested that, given changes in their laws regarding marijuana, the odor of the drug alone does not provide reasonable suspicion to conduct an investigatory stop. *See, e.g.*, *Commonwealth v. Meneide*, 52 N.E.3d 167, 171 n.4 (Mass. App. Ct. 2016) ("The smell of burnt or unburnt marijuana, standing alone, no longer provides either reasonable suspicion or probable cause."); *State v. Moore*, 488 P.3d 816, 821 (Or. Ct. App. 2021) (although a "very strong" odor of unburnt marijuana may be consistent with criminal activity, because adults may legally possess certain quantities of marijuana in Oregon, the odor by itself does not provide reasonable suspicion of an unlawful amount of marijuana); *People v. Brukner*, 25 N.Y.S.3d 559, 572 (N.Y. City Ct. 2015) (concluding that "the mere odor of marihuana emanating from a pedestrian,

28

without more, does not create reasonable suspicion that a crime has occurred") (emphasis deleted); *cf. State v. Francisco Perez*, 239 A.3d 975, 985 (N.H. 2020) (odor of marijuana "*may* serve as a basis for a reasonable suspicion that activities involving marijuana, that are indeed criminal, are underway, when considered among the totality of circumstances") (internal quotation marks and citation omitted). However, we find the reasoning of cases such as *Looby* and *O.S.* more persuasive, as well as more consistent with our body of marijuana-related Fourth Amendment jurisprudence.

Here, the juvenile court correctly ruled that the initial seizure of D.D. and his companions was permissible under the Fourth Amendment. The court credited Sergeant Walden's testimony that the officers smelled the strong odor of marijuana when they encountered the group upon entering the building.[10] Directing the group to stop and sit on the steps while the officers briefly investigated whether their behavior constituted a criminal offense was reasonable under the Fourth Amendment. It was a relatively minor intrusion on the group's freedom of movement. If no probable cause of a criminal offense had developed, the group would have been free to go on its way in short order. *See Illinois v. Wardlow*, 528 U.S. 119, 126 (2000) ("If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way."); *Trott v. State*, 473 Md. 245, 269 (in case involving seizure of a defendant in his car, explaining that, if the

---

[10] The parties believe that this case concerns the odor of marijuana alone – *i.e.*, whether the odor provides reasonable suspicion to conduct a brief investigatory detention. The Court of Special Appeals viewed it that way as well. We granted *certiorari* in this case to decide this important question. Having considered the arguments of the parties, we conclude that we should accept their framing of the issue.

officer had not smelled alcohol on the driver's breath, "the stop would have ended, and [the defendant] would have been free to go"), *cert. denied*, 142 S. Ct. 240 (2021). However, as discussed below, a frisk of D.D. for weapons led to the discovery of a loaded firearm in his waistband. We now consider the validity of that pat-down under the Fourth Amendment.

## B. The Pat-Down of D.D.

D.D. argues that Sergeant Walden lacked reasonable suspicion to believe that he was armed and dangerous before frisking him. D.D. interprets Sergeant Walden's testimony at the suppression hearing as revealing an unconstitutional policy to always frisk the members of a group when officers are outnumbered, whether or not the particular circumstances suggest that anyone in the group may be armed and dangerous. In addition, D.D. contends that Sergeant Walden unreasonably viewed his behavior and that of his companions as "evasive." Regarding the discovery of the suspected handgun on D.D.'s companion, D.D. argues that this Court should not accept the proposition that "if there's one weapon, there could be more." Further, D.D. asserts that the other factors Sergeant Walden relied on in concluding that D.D. might be armed and dangerous – including his baggy clothing and the officers' detection of the odor of marijuana – provide no support for the pat-down. According to D.D., an apt description of the State's showing regarding the frisk is "zero plus zero plus zero still equals zero." Thus, in D.D.'s view, the totality of the circumstances in this case "does not come close" to satisfying the reasonable suspicion standard.

The State contends that its showing at the suppression hearing was not an offering of several zeroes that cumulatively added up to zero. Rather, according to the State,

Sergeant Walden's decision to frisk D.D. was supported by reasonable suspicion that D.D. may have been armed and dangerous. Among other factors, the State relies on the discovery of the weapon on J. and on Sergeant Walden's assessment of the behavior of D.D. and his companions as evasive. We agree with the State.

A police officer is not permitted to frisk a person just because the officer has detained the person to investigate whether criminal activity is afoot. *See Simpler v. State*, 318 Md. 311, 319 (1990) (explaining that "a reasonable frisk does not inevitably follow in the wake of every reasonable stop"). Rather, during a *Terry* stop, a police officer may pat down an individual for weapons if the officer "has reason to believe that [the officer] is dealing with an armed and dangerous individual." *Sellman v. State*, 449 Md. 526, 541 (2016) (quoting *Terry*, 392 U.S. at 27). The purpose of this "limited search, known in common parlance as a frisk, is not to discover evidence, but rather to protect the police officer and bystanders from harm." *Id.* at 542 (internal quotation marks and citation omitted).

"A law enforcement officer has reasonable articulable suspicion that a person is armed and dangerous where, under the totality of the circumstances, and based on reasonable inferences from particularized facts in light of the law enforcement officer's experience, a reasonably prudent law enforcement officer would have felt that he or she was in danger." *Norman*, 452 Md. at 387. As we said in *Sellman,* reasonable suspicion

> is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act. While the level of required suspicion is less than that required by the probable cause standard, reasonable suspicion nevertheless embraces something more than an inchoate and unparticularized suspicion or hunch…. [A] court's

31

determination of whether a law enforcement officer acted with reasonable suspicion must be based on the totality of the circumstances. Thus, the court must not parse out each individual circumstance for separate consideration. In making its assessment, the court should give due deference to the training and experience of the law enforcement officer who engaged the stop at issue. Such deference allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. To be sure, a factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer.

*Sellman*, 449 Md. at 543 (quoting *Crosby*, 408 Md. at 507-08) (cleaned up). The test that a reviewing court applies "is objective: the validity of the stop or the frisk is not determined by the subjective or articulated reasons of the officer; rather, the validity of the stop or frisk is determined by whether the record discloses articulable objective facts to support the stop or frisk." *Id.* at 542 (internal quotation marks and citation omitted).

Based on the totality of the circumstances in this case, we conclude that the officers had reasonable suspicion that D.D. was armed and dangerous. As such, the gun recovered from D.D.'s waistband was the fruit of a lawful frisk, and the juvenile court correctly declined to suppress it.

Sergeant Walden's proffered reasons for the pat-down included the "odor of marijuana," the group's "evasive body language," and the fact that there were "five of them in baggy clothes" in a place "where they could run out the door." The juvenile court credited Sergeant Walden's testimony "regarding the response from some of the males in response to his questions," and "that the young man was evasive." In addition, before Sergeant Walden frisked D.D., Officer Moser discovered a suspected handgun in J.'s waistband that J. said was a BB gun. These circumstances, viewed collectively, would lead

32

a reasonably prudent law enforcement officer to suspect that D.D. was armed and dangerous.

Evasive behavior is a factor that may support a pat-down for weapons. *See, e.g.*, *Flowers v. State*, 195 A.3d 18, 27-28 (Del. 2018) (suspect's turning his body away from advancing officers contributed to reasonable suspicion that he might be armed); *United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017) (suspect responded to the sight of an approaching officer by "pressing the front of his body" against a vehicle "as to further conceal what, if anything, he had in his coat"); *United States v. Diriye*, 818 F.3d 767, 769 (8th Cir. 2016) (subject "appeared to be continuously turning his body to keep his right side away from" the officer, which caused the officer to suspect that the subject may have a gun); *United States v. Patton*, 705 F.3d 734, 739 (7th Cir. 2013) (describing a suspect who "set himself apart from the other men" by not complying with an officers' instruction and taking a number of steps backward).

Here, D.D. and his companions appeared evasive to Sergeant Walden, a 21-year veteran of the Department. None of the members of the group would tell the officers where they lived. After Sergeant Walden specifically asked D.D. where he lived, D.D. shrugged his shoulders and did not respond. D.D. then responded to the same question from Officer Moser by saying "my dick." The group was snickering, laughing, and being uncooperative. In addition, unlike the other four young men in the group, D.D. chose to sit on the staircase that led him to have his back to the officers. D.D.'s positioning prevented Sergeant Walden from seeing D.D.'s hands. Even when D.D. spoke, he kept his body turned away from the

33

officers. Sergeant Walden believed that D.D.'s "evasive body language" indicated that he might be armed.

As D.D. points out, Sergeant Walden did not direct D.D. to sit on the descending staircase. Thus, according to D.D., because he complied with Sergeant Walden's directive to sit down, Sergeant Walden should not have been concerned by the fact that D.D.'s back was to him and that he could not see D.D.'s hands. But Sergeant Walden was not required to rule out every innocent explanation for D.D.'s behavior. Nor is it realistic to expect an officer to engage in such fine analysis when deciding whether to pat someone down for weapons, given that the safety of police officers and third parties may be at stake. In our view, it was reasonable for Sergeant Walden to be concerned that he could not see D.D.'s hands and what D.D. was doing.

In addition to the evasive behavior and body language that Sergeant Walden observed prior to any of the group members being frisked, it is significant that Officer Moser discovered a weapon in the waistband of J., the first young man the officers frisked.

Assuming the weapon was a BB gun as J. claimed,[11] BB guns can be lethal.[12] Once Sergeant Walden knew that another member of the group was armed with some sort of gun, his level of suspicion concerning D.D. reasonably increased.

This is not to say that whenever one member of a group is found to possess a weapon, officers necessarily have reasonable suspicion to believe that every other member of the group may be armed and dangerous, thereby automatically justifying a pat-down of all companions present. *See United States v. Matías-Maestres*, 738 F. Supp. 2d 281, 289 (D.P.R. 2010) (discovery of handgun on driver of car did not justify frisk of passenger, where there was no other basis to suspect that the passenger may be armed and dangerous). However, the possession of a weapon by one member of a group is a highly significant factor that, in combination with other circumstances, may well support a pat-down for weapons of other members of the group. *See El-Amin v. Commonwealth,* 607 S.E.2d 115, 118-19 (Va. 2005) (after a frisk of one member of a group revealed a pellet gun, another officer patted down El-Amin and discovered a .38 caliber revolver; although the Virginia

---

[11] The juvenile court did not make a finding as to whether the weapon removed from J.'s waistband was a BB gun or whether the officers had reason to believe the weapon was a BB gun before Sergeant Walden frisked D.D. It is well known that BB guns are difficult to tell apart from "real" guns. *See* Megan Raposa, *Real or fake guns: Can you tell the difference?*, Argus Leader (Mar. 4, 2016), available at https://perma.cc/7VB9-VR5K (according to a Captain in the Minnehaha County Sheriff's Office, "[e]ven in the best light in the best possible conditions, it is virtually impossible to tell the difference between a real handgun and a BB gun, toy gun, fake gun, replica gun, anything like that"). Sergeant Walden and Officer Moser were not required to verify J.'s claim that the weapon in his waistband was a BB gun before frisking D.D.

[12] *See* U.S. Consumer Product Safety Commission, *BB Guns Can Kill*, CPSC Publication 5089, available at https://perma.cc/78BB-8WMH.

Supreme Court declined to adopt an "automatic companion" rule, the Court held that the "circumstances in this case support the officer's objectively reasonable apprehension that, upon discovery of a weapon on the person of one member of the group, the other members of the group might also be armed and dangerous").

In addition, D.D. wore baggy clothing, including a puffy jacket, that could conceal a weapon. To be sure, it is less concerning when someone wears a puffy coat on a cold night in November (as was the case here) than on a summer evening. *See United States v. Key*, 621 F. App'x 321, 323 (6th Cir. 2015) (suspect's "unseasonably heavy attire" was a factor that, combined with other circumstances, justified a frisk). However, we cannot say that Sergeant Walden was unreasonable in ascribing any significance to D.D.'s baggy clothing. *See Davis v. State*, 133 Md. App. 260, 268 n.5 (2000) (although recognizing that many people wear "baggy clothing" "for comfort or to make a fashion statement," stating that "[t]he wearing of baggy clothing may properly be considered in conjunction with other factors in formulating reasonable suspicion by a reasonable and cautious police officer guided by experience and training"); *see also State v. Khingratsaiphon,* 572 S.E.2d 456, 460 (S.C. 2002) (among other circumstances justifying a frisk for weapons was the fact that "Petitioner and the two other men were dressed in baggy clothing (which could easily conceal a weapon)").

Further, Sergeant Walden was permitted to consider the odor of marijuana that he smelled coming from the young men, as well as his concern that they were trespassing, as additional factors bearing on whether D.D. was armed and dangerous. *See Sellman*, 449 Md. at 560-61 (minor crimes, such as possession of marijuana, "do not, in and of

36

themselves, justify a *Terry* frisk *without additional circumstances* that establish reasonable suspicion that a suspect is armed and dangerous") (emphasis in original). Indeed, in *Norman* this Court acknowledged the "indisputable nexus between drugs and guns" and reasoned that "[w]here, in addition to the odor of marijuana, another circumstance or other circumstances are present giving rise to reasonable articulable suspicion that an [individual] is armed and dangerous, a law enforcement officer may frisk" the individual, even following decriminalization. *Norman*, 452 Md. at 423, 425.

Finally, Sergeant Walden could consider the fact that he and Officer Moser were outnumbered five to two. *See United States v. Braxton*, 456 F. App'x 242, 247 (4th Cir. 2011) (noting as a factor justifying a frisk that the officers were outnumbered by the passengers in the vehicle that the officers had stopped, and observing that "[p]roper adherence to the standards of *Terry* does not require us to gamble with the lives of police officers who exercise reasonable judgment in fulfilling their duty in the trying situation presented by a roadside car stop"); *People v. Colyar*, 996 N.E.2d 575, 585 (Ill. 2013) (noting that officers were outnumbered three to two as one of several factors that made it reasonable for the officers to believe that they were in danger); *United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003) (that officer was outnumbered by suspects two to one and that the stop occurred at a public bus station, were factors that supported officer's "reasonable belief that his safety and that of others was in danger").

D.D. interprets Sergeant Walden's testimony as stating that the Department's policy is to conduct pat-downs for weapons whenever officers are outnumbered during a *Terry*

stop. Although we certainly would be concerned if that were the policy of the Department,[13] we do not read Sergeant Walden's testimony as D.D. does. Sergeant Walden did not testify that he frisked D.D. because he always frisks every detainee per departmental policy. Rather, in response to a question about "how officers are trained to respond when they're outnumbered," Sergeant Walden stated that officers are taught to request backup and that "you shouldn't handle any call by yourself." He then explained that "there are times where you're put in that position to *where there are several people coming at you*, so you have to get the advantage. And one of the first concerns is a weapon that they could use against you." (Emphasis added.) Thus, Sergeant Walden did not link his concern about a weapon to every situation in which officers are outnumbered, but rather to those instances "where there are several people coming at you."

Regarding this case, Sergeant Walden made clear that he decided to frisk D.D. not solely because the officers were outnumbered. Rather, his "first concern" was that one of the members of the group might have a weapon. Although Sergeant Walden then referenced the five-to-two ratio, in the next breath he stated that the young men "were right by a door where they could run out the door, plus the odor … of marijuana, that there was

---

[13] In *Sellman*, this Court described police department policies authorizing the blanket, indiscriminate frisking of all individuals present during a police-citizen encounter as "pernicious institutionalized procedure[s]" that are "unlawful" and "counter to *Terry* and its progeny." *Sellman*, 449 Md. at 557. We emphasized that "[w]hile there undoubtedly is some risk to the police in every confrontation, *Terry* has never been thought to authorize a protective frisk on the occasion of every authorized stop." *Id.* at 558 (internal quotation marks and citation omitted); *see also United States v. Hughes*, 517 F.3d 1013, 1019 (8th Cir. 2008) ("Being outnumbered does not justify a frisk where the initial *Terry* stop is not justified.").

illegal drug activity there, the fact that nobody could provide any identification that they live inside that building." Sergeant Walden then went on to say, "[s]o the first thing we want to do is secure them and make sure that they don't have any weapons on them." A fair reading of that statement is that, after Sergeant Walden developed concern that one or more of the young men might be armed *based on all the factors he had just listed*, he and Officer Moser decided to check the group for weapons before continuing their investigation. Viewing the evidence in the light most favorable to the State, as we must, we agree with the State that "[t]his was not the testimony of an officer who merely did the math, concluded there were more people than officers, and applied a departmental policy regardless of the situation."

In any event, even if there was a policy to pat down all detainees when officers are outnumbered – and, again, we cannot conclude based on this record that the Department had such a policy – by the time Sergeant Walden frisked D.D., he had developed reasonable, articulable suspicion that D.D. might be armed and dangerous based on the totality of the circumstances discussed above.

The pat-down of D.D. for weapons was reasonable under the Fourth Amendment. Accordingly, the juvenile court correctly declined to suppress the gun that Sergeant Walden discovered as a result of the frisk.

**IV**

**Conclusion**

Even following partial decriminalization, the odor of marijuana on a person provides reasonable suspicion to conduct a brief investigatory detention to attempt to

39

determine whether the person has committed a criminal offense. In this case, the officers detected the odor of marijuana when they encountered the group of young men of which D.D. was a part. The initial stop of D.D. was reasonable under the Fourth Amendment. The subsequent pat-down of D.D. for weapons also was lawful because, under the totality of the circumstances, the officers had reasonable suspicion that D.D. was armed and dangerous. Accordingly, the juvenile court correctly declined to suppress the gun that the officers discovered as a result of the frisk. The Court of Special Appeals erred in overturning the juvenile court's suppression ruling. We therefore reverse the judgment of the Court of Special Appeals and remand the case to that Court with the instruction to affirm the judgment of the juvenile court.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED WITH INSTRUCTION; COSTS IN THE COURT OF SPECIAL APPEALS AND THIS COURT TO BE PAID BY RESPONDENT.**

Circuit Court for Prince George's County
Case No. JA-19-0409
Argued: January 6, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 27

September Term, 2021

_____

IN RE: D.D.

_____

*Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Raker, Irma S. (Senior Judge,
Specially Assigned),

JJ.

_____

Concurring Opinion by Watts, J.

_____

Filed: June 21, 2022

*Getty, C.J., and McDonald, J., now Senior
Judges, participated in the hearing and
conference of this case while active members of
this Court. After being recalled pursuant to Md.
Const., Art. IV, § 3A, they also participated in
the decision and adoption of this opinion.

Respectfully, I concur. I would hold that the odor of marijuana alone is not enough to give rise to reasonable articulable suspicion to conduct an investigatory <u>Terry</u> stop,[1] but would conclude that, in this case, there was more than just the odor of marijuana that gave rise to reasonable articulable suspicion to justify the stop. Like the Majority, I would reverse the judgment of the Court of Special Appeals. <u>See</u> Maj. Slip Op. at 3. But, I would conclude that the totality of the circumstances in this case involved more than the odor of marijuana.

It is now well-established in Maryland that the odor of marijuana, standing alone, does not provide probable cause for a law enforcement officer to arrest and conduct a warrantless search of a person incident to the arrest. <u>See</u> <u>Lewis v. State</u>, 470 Md. 1, 10, 233 A.3d 86, 91 (2020). The odor of marijuana emanating from a vehicle, however, supplies probable cause for a law enforcement officer to conduct a search of the vehicle, "as marijuana in any amount remains contraband, notwithstanding the decriminalization of possession of less than ten grams of marijuana; and the odor of marijuana gives rise to probable cause to believe that the vehicle contains contraband or evidence of a crime." <u>Robinson v. State</u>, 451 Md. 94, 137, 152 A.3d 661, 687 (2017).

As to vehicles, in <u>Robinson</u>, <u>id.</u> at 128, 131, 152 A.3d at 681, 683, in holding "that a warrantless search of a vehicle is permissible upon detection of the odor of marijuana emanating from the vehicle[,]" we concluded "that marijuana remains contraband, despite

---

[1]"Law enforcement officers may conduct an investigatory stop or detention when the officers have reasonable suspicion that a person has committed or is about to a commit a crime, commonly known as a *Terry* stop[,]" <u>Lewis v. State</u>, 470 Md. 1, 12 n.3, 233 A.3d 86, 92 n.3 (2020) (cleaned up), derived from <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

the decriminalization of possession of small amounts of marijuana, and that, as such, the odor of marijuana constitutes probable cause for the search of a vehicle." We explained that, under the Fourth Amendment, "probable cause to search exists where a person of reasonable caution would believe that contraband or evidence of a crime is present[,]" and that "'contraband' means goods that are illegal to possess, regardless of whether possession of the goods is a crime." Id. at 128, 252 A.3d at 681-82 (cleaned up).

The definition of "contraband" was informed by the conclusion of the Supreme Court in Carroll v. United States, 267 U.S. 132, 158-59 (1925) "that a law enforcement officer can search a vehicle based on probable cause to believe that the vehicle's contents are contraband, even if the law enforcement officer cannot arrest the driver." Robinson, 451 Md. at 128, 252 A.3d at 682. With respect to the automobile exception to the warrant requirement, in Carroll, 267 U.S. at 153, the Supreme Court held that, if there is probable cause to believe that a vehicle contains contraband, then a law enforcement officer may search the vehicle without a warrant given that a vehicle can be quickly moved from one jurisdiction to another, thereby making obtainment of a warrant impractical. In light of the Carroll doctrine and the mobility of vehicles, among other reasons, a law enforcement officer has probable cause to search a vehicle where the officer detects an odor of marijuana emanating from the vehicle.

A search of an individual is different. In Pacheco v. State, 465 Md. 311, 330, 214 A.3d 505, 516 (2019), although we concluded that law enforcement officers had probable cause to search the defendant's vehicle based on an odor of marijuana and the presence of a joint in the center console of the vehicle, we concluded that the officers did not likewise

have the right to search the defendant's person. We explained that the facts of the case did not meet the standard for probable cause to arrest and search the defendant incident to arrest because the officers did not possess, prior to the search, probable cause to believe that the defendant was committing a felony or misdemeanor in their presence. See id. at 330-32, 214 A.3d at 516-17. Stated otherwise, we determined that the record did not support a conclusion that the officers had probable cause to arrest the defendant "based on the belief that he was committing, had committed, or was about to commit a crime in their presence." Id. at 333, 214 A.3d at 517. We concluded that, although circumstances may justify the search of a vehicle, the same circumstances "do not necessarily justify an arrest and search incident thereto." Id. at 333, 214 A.3d at 518. This is due to "the heightened expectation of privacy one enjoys in his or her person as compared to the diminished expectation of privacy one has in an automobile." Id. at 333, 214 A.3d at 518.

Later, in Lewis, 470 Md. at 10, 233 A.3d at 91, we unequivocally held that the odor of marijuana alone does not provide a law enforcement officer with probable cause to arrest an individual and then conduct a warrantless search of the individual incident to the arrest. In other words, "more than the odor of marijuana is required for probable cause to arrest a person and conduct a search incident thereto." Id. at 17, 233 A.3d at 95. Relying on Pacheco, we determined that law enforcement "officers must have probable cause to believe a person possesses a criminal amount of marijuana in order to arrest that person and conduct a search incident thereto." Lewis, 470 Md. at 23, 233 A.3d at 99. We stated that, although marijuana in any amount is considered contraband under Robinson, an officer may conduct a search incident to arrest "only upon the occurrence of a felony or

attempt of a felony or misdemeanor; a civil infraction is neither a felony nor misdemeanor. The odor of marijuana alone is not indicative of the quantity (if any) of marijuana in someone's possession[.]" Lewis, 470 Md. at 23, 233 A.3d at 99. We concluded that "[t]he Fourth Amendment's protection against unreasonable searches and seizures prohibits law enforcement officers from arresting and searching a person without a warrant based solely upon the odor of marijuana on or about that person." Id. at 27, 233 A.3d at 101.

Just as the odor of marijuana alone does not give rise to probable cause to arrest and search a person incident to arrest, I would hold that the odor of marijuana alone is not enough to give rise to reasonable articulable suspicion to stop a person. Indeed, practical reasons militate against using something as amorphous and fleeting as the odor of marijuana alone as a ground to stop someone.[2] I completely agree with the holding of the Court of Special Appeals—"that the odor of marijuana, by itself, does not provide reasonable suspicion of criminal activity, and therefore, a stop based on this circumstance alone is unreasonable under the Fourth Amendment." In re D.D., 250 Md. App. 284, 288, 250 A.3d 284, 286-87 (2021). I also agree, though, with the Court of Special Appeals's conclusion that "[t]he odor of marijuana may, with other circumstances, provide reasonable suspicion that a person is involved in criminal activity." Id. at 301, 250 A.3d at 295.

That said, I disagree with the determination that this case involved only the odor of marijuana and that, "[a]ccordingly, Officer Walden did not have reasonable suspicion of

---

[2]Moreover, holding that the odor of marijuana alone gives rise to reasonable articulable suspicion supporting an investigatory stop could potentially result in unnecessary and unwarranted police activity that may have a disparate effect in the community.

criminality to support the stop, and it was unreasonable under the Fourth Amendment." Id. at 301, 250 A.3d at 295. The Court of Special Appeals apparently interpreted this case to be a case raising the issue of whether the odor of marijuana alone can form the basis for reasonable articulable suspicion for a Terry stop and that interpretation has followed the case to this Court. I see the case somewhat differently. From my perspective, this case raises the question of whether the odor of marijuana along with other circumstances was sufficient to give rise to reasonable articulable suspicion to support the stop. This is not a case in which there was solely the odor of marijuana and nothing else. Although the parties framed the issue in this case as involving the question of whether the odor of marijuana alone could give rise to reasonable articulable suspicion for a Terry stop, the case presented additional facts. It was everything together that gave rise to reasonable articulable suspicion for the stop. In my view, concluding that the odor of marijuana alone is sufficient, even though the case involved more than the odor of marijuana, will lead to stops occurring based on much less information than what was available to the officer in this case and under circumstances where it may not have been possible to have had reasonable suspicion that a person possessed at least ten grams of marijuana.

I would conclude that, under the circumstances of this case, which included Sergeant Walden detecting the odor of marijuana and additional facts, there was reasonable articulable suspicion for the stop. In this case, Sergeant Walden responded to a police dispatch call for service at an apartment complex reporting that there were "males in the basement playing music and smoking CDS." At trial, on direct examination, the following exchange occurred:

[PROSECUTOR:] Okay. And did you receive a call that day to go to Ronald Road in Capitol Heights?

[SERGEANT WALDEN:] I did.

[PROSECUTOR:] Okay. And do you recall where, where were you and where did you respond to?

[SERGEANT WALDEN:] I was on routine patrol and I acknowledged the radio, so I responded via my police vehicle, along with a back-up officer to respond to a call for males in the basement playing music and smoking CDS.

[PROSECUTOR:] Okay. When you say CDS, what does that mean?

[SERGEANT WALDEN:] CDS is a controlled dangerous substance.

[PROSECUTOR:] Okay. And was there a specific complaint that you were responding to in terms of CDS?

[SERGEANT WALDEN:] Loud music and the smell of marijuana.

[PROSECUTOR:] Okay. So upon arriving at [] Ronald Road in Capitol Heights, what did you do?

[SERGEANT WALDEN]: It's a split foyer, so I opened the front door and as soon as I opened the front door I saw a group of males walking up the steps towards me and I smelled a strong odor of marijuana.

[PROSECUTOR:] Okay. And what do you do next?

[SERGEANT WALDEN:] At that time since there was five subjects and I had no idea if they lived there or what was going on, and because of the nature of the complaint, it was myself and just one other officer there, so there was five of them coming up the stairs. So I stopped them and I had them have a seat on the stairs and I asked them, I said could you please have a seat, who lives here.

On cross-examination, the following exchange occurred:

[DEFENSE COUNSEL:] Officer Walden, the initial call for CDS and loud music came through at 7:10 p.m., correct?

[SERGEANT WALDEN:] I believe so, yes.

[DEFENSE COUNSEL:] And you responded to [] Ronald Road at 7:42?

[SERGEANT WALDEN:] Correct.

[DEFENSE COUNSEL:] And when you responded, you were with Officer Moser?

[SERGEANT WALDEN:] Correct, yes.

According to Sergeant Walden, the call came through at approximately 7:10 p.m. Sergeant Walden responded to the address at 7:42 p.m., approximately thirty minutes later, with Officer Moser. When Sergeant Walden reached the apartment building and opened the front door, he saw D.D. and four other people walking up a set of steps and he "smelled a strong odor of marijuana." Sergeant Walden had been a certified drug dog trainer for over seventeen years and recognized the smell of marijuana. Sergeant Walden told D.D. and his companions to have a seat on the steps and began questioning them.

In my view, the stop occurred when Sergeant Walden told the group to have a seat on the steps. The responses that Sergeant Walden later received to his questions did not play a role in the formation of reasonable articulable suspicion for the stop. Rather, all of the information that Sergeant Walden possessed about the call and his encounter with the D.D. and his companions formed the basis for reasonable articulable suspicion—namely, Sergeant Walden responded to a call specifically stating that multiple people, in the basement of an apartment building, were smoking a controlled dangerous substance. It is unclear from the record whether the dispatcher advised Sergeant Walden that the call was for people smoking "CDS" as the Sergeant initially testified or smoking marijuana, but it matters not. A report of individuals smoking CDS would potentially raise the level of

reasonable articulable suspicion above suspicion of possession of at least ten grams of marijuana given that the acronym CDS could have indicated that the individuals were smoking any type of potential controlled dangerous substance. Even though the State has not contended, despite the Sergeant's testimony, that the call was for anything other than smoking marijuana, this is not a case involving the smell of marijuana alone.

Just over thirty minutes after receiving the dispatch call, Sergeant Walden arrived at the building, opened the door, saw a group of people walking up the steps toward him, and smelled the strong odor of marijuana. This corroborated the information in the call—that people were smoking marijuana, a controlled dangerous substance, in the basement of the building. It was entirely reasonable for Sergeant Walden to believe that the group walking up the stairs were the people in the basement who had been reported to be smoking marijuana in the building and that they had been doing so for a period of time. In addition, Sergeant Walden smelled a strong odor of marijuana.

These circumstances, in my view, gave rise to a reasonable articulable suspicion that any one or all of the individuals may have possessed ten grams or more of marijuana. Ten grams is a small amount of marijuana, and it was reasonable for Sergeant Walden to believe that this was a group of people who had been smoking marijuana for at least thirty minutes in the basement of the building before he arrived. Sergeant Walden was not required to assume that this could have been a different group or that the caller had been wrong. Under the circumstances, there was reasonable articulable suspicion to believe that one or all of the people in the group may have possessed at least ten grams of marijuana, thus justifying the investigatory stop.

- 8 -

The reasonable articulable suspicion standard is less than the probable cause standard. An investigatory or Terry stop is authorized where a law enforcement "officer has reasonable suspicion, supported by articulable facts, that criminal activity may be afoot." In re David S., 367 Md. 523, 532, 789 A.2d 607, 612 (2002). By contrast, as we explained in Pacheco, 465 Md. at 322, 214 A.3d at 511, a law enforcement officer is authorized to conduct a warrantless search incident to arrest where the officer has "probable cause to believe that the person subject to arrest has committed a felony or is committing a felony or misdemeanor in the presence of the police." (Citations omitted). To conduct an investigatory stop, an officer does not need to discern a fair probability that criminal activity may have been afoot, just reasonable suspicion.

Where a law enforcement officer encounters the odor of marijuana, along with information about other circumstances, such as multiple people being responsible for the odor and the odor existing over a period of time, the officer could reasonably suspect that criminal activity—possession of at least ten grams of marijuana—may have been afoot and may briefly detain the individual or individuals. In Maryland, possessing ten grams of marijuana or more remains criminal activity, whereas possessing less than ten grams is non-criminal conduct for which a civil citation would be warranted. In other words, the odor of marijuana does not equate with entirely innocent or non-criminal behavior, given that possession of marijuana is not legalized or fully decriminalized. Even non-criminal behavior can form the basis for reasonable articulable suspicion. See, e.g., Crosby v. State, 408 Md. 490, 507-08, 970 A.2d 894, 904 (2009) (This Court stated that a determination as to whether an "officer acted with reasonable suspicion must be based on the totality of the

circumstances" and that a circumstance or factor, "by itself, may be entirely neutral and innocent," but "can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." (Cleaned up)).

Given that the odor of marijuana suggests either criminal behavior or a civil violation, under the circumstances in this case—a call to the police reporting a group smoking marijuana in the basement of a building with an exact address given, the officer responding and seeing a group of people coming up the stairs of the building, that the officers responded to the location thirty minutes after receiving the call, and that the officer detected what the officer described as the "strong odor" of marijuana—the officer had reasonable articulable suspicion to conduct the investigatory stop. Sergeant Walden testified that there were five people coming from the basement, that he had no idea whether they lived in the building, and that he smelled a strong odor of marijuana. The officer would have known that the circumstances that he encountered fully corroborated the substance of the call and would have had a reasonable basis to believe that the facts underlying the call had been substantiated.

This is not a case in which an officer walked past a person and alleged a fleeting whiff of marijuana or even a case in which the officer's credibility in terms of having encountered the smell of marijuana under uncorroborated circumstances is at issue. The officer testified that he smelled marijuana, and there is no doubt that there was a call to the police department reporting that people were smoking CDS or marijuana approximately thirty minutes before the officer arrived at the location. When the officer arrived after receiving the dispatch call, the strong smell of marijuana was still there, along with five

people. The number of people involved, the time that the people had been at the location between the call initially reporting the smell of marijuana and the officer's arrival, and the officer's detection of the strong odor of marijuana, were factors that gave rise to the reasonable articulable suspicion that on or more members of the group possessed at least ten grams of marijuana. Where an officer receives a call for multiple people at a precise location smoking marijuana, and the officer arrives at the location and multiple people are at the location and the strong smell of marijuana is present, the officer has reasonable suspicion for an investigatory stop as the facts give rise to reasonable articulable suspicion of possession of at least ten grams of marijuana. Unless the possession of marijuana is legalized or further decriminalized, the odor of marijuana with other circumstances that suggest possession of at least ten grams of marijuana, under a totality of circumstances analysis, may give rise to reasonable articulable suspicion to conduct a stop.[3]

For the above reasons, respectfully, I concur.

---

[3]I would hold that there was reasonable articulable suspicion justifying the stop, and like the majority opinion, I would conclude that the pat-down or frisk of D.D. was lawful because, under the totality of the circumstances, "the officers had reasonable suspicion that D.D. was armed and dangerous." Maj. Slip Op. at 32.

Circuit Court for Prince George's County
Case No. JA-19-0409
Argued: January 6, 2022

_____

IN RE: D.D.

_____

*Getty, C.J.,
*McDonald,
Watts,
Hotten,
Booth,
Biran,
Raker, Irma S.,
 (Senior Judge, Specially Assigned)

JJ.

_____

Dissenting Opinion by Hotten, J., which
Raker, J., joins.

_____

Filed:  June 21, 2022

*Getty, C.J. and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of the majority opinion.

For the reasons articulated below, I respectfully dissent from both conclusions of the majority that the investigatory stop of Respondent D.D. was constitutionally justified and that the frisk of Respondent was supported by reasonable suspicion that Respondent was armed and dangerous. I would therefore affirm the decision of the Court of Special Appeals that evidence of the firearm recovered from Respondent should have been suppressed as the fruit of an unlawful search. *See In re D.D.*, 250 Md. App. 284, 301–02, 250 A.3d 284, 295, *cert. granted*, 475 Md. 701, 257 A.3d 1162 (2021).

**Reasonable Suspicion and the Terry Stop and Frisk**

The Fourth Amendment of the United States Constitution and the Maryland Declaration of Rights prohibit warrantless searches and seizures. U.S. CONST. amend. IV. ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); MD. CONST. DECL. OF RTS. art. 26 ("[A]ll warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."). However, both the United States Supreme Court and this Court have recognized various exceptions to this general prohibition. *See, e.g.*, *Grant v. State*, 449 Md. 1, 16–17, 141 A.3d 138, 146–47 (2016) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)).

One prominent exception to the warrant requirement is known as the "*Terry* Stop," named after the Supreme Court decision *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), which permits an officer "with reasonable suspicion, supported by articulable facts, that criminal activity 'may be afoot[]'" to "stop and detain a person, briefly, for investigative purposes." *Longshore v. State*, 399 Md. 486, 506, 924 A.2d 1129, 1140 (2007) (citing *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884). If, while conducting such a stop, the officer develops a reasonable suspicion supported by articulable facts "that the person with whom the officer is dealing is armed and dangerous, the officer may conduct a carefully limited [frisk] of the outer clothing of such person in an attempt to discover weapons which might be used to assault the officer." *State v. Smith*, 345 Md. 460, 465, 693 A.2d 749, 751 (1997). Such an action is known as a "*Terry* frisk." *See Norman v. State,* 452 Md. 373, 424, 156 A.3d 940, 970 (2017).

*Terry* stops and *Terry* frisks must both be supported by reasonable suspicion. We have explained that although there is "no standardized test governing what constitutes reasonable suspicion[,] . . . [i]t has been defined as nothing more than a particularized and objective basis for suspecting the particular person stopped of criminal activity[.]" *Crosby v. State*, 408 Md. 490, 507, 970 A.2d 894, 903 (2009) (internal citations and quotations omitted). The standard of reasonable suspicion should be treated as a "common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act[]" but still must be based on more than an "inchoate and unparticularized suspicion or hunch." *Id.*, 970 A.2d at 903–04. Whether reasonable suspicion exists must be viewed under the "totality of the circumstances" of the case. *Holt*

2

*v. State*, 435 Md. 443, 460, 78 A.3d 415, 424 (2013) (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002)).

The reasonable suspicion standards for *Terry* stops and *Terry* frisks have different objects. In the context of a *Terry* stop, an officer must have reasonable suspicion that the person stopped is engaged in criminal activity, while in the context of a *Terry* frisk, the officer must have reasonable suspicion that the suspect is "armed and dangerous[.]" *Smith*, 345 Md. at 465, 693 A.2d at 751. We have explained that "[t]he purpose of the *Terry* frisk, by diametric contrast [to the purpose of a *Terry* stop], is not directly crime-related at all but is exclusively concerned with officer safety, with safeguarding the life and limb of the officer[.]" *Norman,* 452 Md. at 424, 156 A.3d at 970 (quoting *Ames v. State*, 231 Md. App. 662, 673, 153 A.3d 899, 905 (2017)).

**The Fourth Amendment Relevance of the Scent of Marijuana after Decriminalization in Maryland**

In 2014, the Maryland legislature decriminalized possession of less than ten grams of marijuana, making it a civil offense punishable by a fine instead of a crime. Md. Code Ann., Criminal Law ("Crim. Law") § 5-601(c)(2)(ii); *see also Lewis*, 470 Md. 1, 9, 233 A.3d 86, 91 (2020). Possession of more than ten grams of marijuana remains a crime. *See* Crim. Law § 5-601(c)(2)(i). In *Robinson v. State*, the first post-2014 Maryland case to discuss the relevance of the scent of marijuana under the Fourth Amendment, we held that law enforcement officers have probable cause to conduct a warrantless vehicle search based solely on the odor of marijuana, even in light of the legislature's decriminalization scheme. 451 Md. 94, 137, 152 A.3d 661, 687 (2017). We reasoned that "marijuana in any

3

amount remains contraband," and thus "the odor of marijuana gives rise to probable cause to believe that the vehicle contains contraband or evidence of a crime." *Id.*, 152 A.3d at 687 (referencing the "automobile exception" from *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280 (1925), which permits warrantless searches of automobiles where an officer has probable cause to suspect the vehicle contains contraband or evidence of a crime).

In *Norman*, issued the same year as *Robinson*, we clarified that although the odor of marijuana can provide probable cause to conduct a search of a vehicle, it does not provide reasonable suspicion to conduct a frisk of the occupants in that vehicle. *Norman*, 452 Md. at 379, 156 A.3d at 943. We specifically stated that "[a]n odor of marijuana alone emanating from a vehicle with multiple occupants does not give rise to reasonable articulable suspicion that the vehicle's occupants are armed and dangerous and subject to frisk." *Id.*, 156 A.3d at 944. Similarly, in *Pacheco v. State*, we dealt with a case in which police approached an individual in a parked car and observed a strong odor of marijuana and a marijuana cigarette in the car. 465 Md. 311, 317–18, 214 A.3d 505, 508–09 (2019). The police immediately told the individual to exit the vehicle, searched him, discovered cocaine in his left front pocket, and subsequently searched his vehicle. *Id.* at 318, 214 A.3d 505 509. We held that although the police's search of the vehicle was warranted based on *Robinson*, the arrest and subsequent search of Pacheco's person was not permissible under the Fourth Amendment. *Id.* at 330, 214 A.3d at 516. We reasoned that there is a diminished expectation of privacy in one's vehicle, but that there is "'unique, significantly heightened' constitutional protections afforded a person to be secure in his or her body[.]" *Id.* at 326, 214 A.3d at 513.

4

Most recently in *Lewis v. State*, 470 Md. 1, 233 A.3d 86 (2020), we addressed the significance of the odor of marijuana outside of the vehicle context. In that case, we rejected the argument that the odor of marijuana emanating from an individual in a grocery store gave police probable cause to arrest and search the individual. *Id.* at 27, 233 A.3d at 101. We explained that when considering the propriety of an arrest and search incident to that arrest, we consider the "likelihood of the guilt of the arrestee and whether probable cause existed to believe that a felony was committed or a felony or misdemeanor was being committed in the presence of law enforcement." *Id.* at 22, 233 A.3d at 98. As such, the odor of marijuana alone did not give the officers in *Lewis* probable cause to arrest and search the petitioner because marijuana under ten grams is neither a felony nor misdemeanor, but a civil offense, and "[t]he odor of marijuana alone is not indicative of the quantity (if any) of marijuana in someone's possession[.]" *Id.* at 23, 233 A.3d at 99.

**Application to the Stop and Frisk of Respondent**

The parties before us present two issues. The first is whether, as a matter of first impression, the odor of marijuana alone provided reasonable suspicion to conduct a *Terry* investigatory stop of Respondent. The second is whether the totality of the circumstances provided Officer Jeff Walden with reasonable suspicion Respondent was armed and dangerous so that it was permissible for him to conduct a *Terry* frisk of Respondent. As explained below, I would answer both questions in the negative.

### A. The smell of marijuana alone did not provide reasonable suspicion to conduct an investigatory stop of Respondent

The Court of Special Appeals below relied heavily on *Lewis* in finding that the officer's investigatory stop of Respondent was not supported by reasonable suspicion. *Lewis* dealt with the higher standard of probable cause necessary for an arrest and search incident to the arrest. We have recognized, in line with United States Supreme Court precedent, that:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause[.]

*Cartnail v. State*, 359 Md. 272, 287, 753 A.2d 519, 527 (2000) (quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990)). Probable cause requires the existence of "facts and circumstances within the knowledge of the officer at the time of the arrest, or of which the officer has reasonably trustworthy information, [that] are sufficient to warrant a prudent person in believing that the suspect had committed or was committing a criminal offense.'" *Barrett v. State*, 234 Md. App. 653, 666, 174 A.3d 441, 449 (2017) (quoting *Moulden v. State*, 212 Md. App. 331, 344, 69 A.3d 36, 44 (2013)). In contrast, reasonable suspicion necessary for a *Terry* investigatory stop, need only arise from "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Holt*, 435 Md. at 459, 78 A.3d at 424. This lesser standard is justified by the fact that a *Terry*

6

stop is less intrusive than a formal custodial arrest.[1] *See Wilson v. State,* 409 Md. 415, 439–40, 975 A.2d 877, 891–92 (2009) (holding that an assessment of the reasonableness of an officer's actions is dependent on the level of the intrusion, and that a *Terry* stop is less intrusive than a formal custodial arrest).

In 2014, Maryland joined other jurisdictions that have decriminalized the possession of marijuana. As the majority observed, several of these jurisdictions have concluded that the smell of marijuana, alone, does not provide reasonable suspicion to conduct an investigatory stop. *See* Maj. slip op. at 28. In *State v. Moore*, the Court of Appeals of Oregon explained that its "historic treatment of all marijuana odors as equal for purposes of reasonable suspicion was grounded in 'the legal status of marijuana as contraband in *any* amount,' a premise that no longer applies, requiring us to adjust our analysis accordingly going forward." 311 Or. App. 13, 19, 488 P.3d 816, 819 (2021) (citations omitted) (emphasis in original). The court further explained:

> As the legal status of cannabis in Oregon has changed, so too does the role that the odor of marijuana plays in the reasonable suspicion calculus. [A] strong odor *can* signal the presence of marijuana, but *not necessarily* the

---

[1] To distinguish between an investigatory *Terry* stop and a custodial arrest, courts will consider: "the length of the detention, the investigative activities that occur during the detention, and the question of whether the suspect is removed from the place of the stop to another location[]" under a totality of the circumstances. *Chase v. State*, 224 Md. App. 631, 643–44, 121 A.3d 257, 264 (2015).

presence in a quantity that is illegal. . . . For that reason, *odor adds only that much to the calculus—that some amount of marijuana may be present*.

*Id.*, 488 P.3d at 819–20 (marks and citation omitted) (some emphasis added and some emphasis in original).

Similar to how the decriminalized status of marijuana minimized the importance of odor in the reasonable suspicion calculus in Oregon, the decriminalized status of marijuana in Maryland should accordingly minimize the importance of the odor in the reasonable suspicion calculus in our constitutional jurisprudence. Possession of less than ten grams of marijuana is generally no longer a crime in Maryland. Crim. Law § 5-601(c)(2)(ii). Maryland also permits possession of medical marijuana for certain medical necessities or usages. Crim. Law § 5-601(c)(3). The smell of odor on a person, alone, makes it impossible for law enforcement to determine whether the person has engaged in a wholly innocent activity, a civil offense, or a crime.

While reasonable suspicion is a relatively low barrier, law enforcement may not rely on a hunch that a person *may* possess ten grams of odor in a non-medicinal capacity to form a basis of reasonable suspicion. *See Crosby* 408 Md. at 507, 970 A.2d at 904. In the case at bar, law enforcement smelled the odor of marijuana emanating from Respondent and his companions, but there was no articulable basis for why any of the individuals were carrying more than ten grams of marijuana. I would have concluded that the odor of marijuana, alone, did not provide reasonable suspicion to stop Respondent.

**B. The totality of the circumstances did not justify the frisk of Respondent**

Assuming *arguendo* that the *Terry* stop of Respondent was lawful, I also depart from the majority in my conclusion as to the constitutionality of the frisk of Respondent. "Although a reasonable 'stop' is a necessary predecessor to a reasonable 'frisk,' a reasonable 'frisk' does not inevitably follow in the wake of every reasonable 'stop.'" *Simpler v. State*, 318 Md. 311, 319, 568 A.2d 22, 25–26 (1990) (quoting *Gibbs v. State*, 18 Md. App. 230, 238–39, 306 A.2d 587, 592 (1973)). The State does not argue that the odor of marijuana alone provided reasonable suspicion that Respondent might have been armed and dangerous, nor can it. *See Norman*, 452 Md. at 379, 156 A.3d at 944 ("An odor of marijuana alone emanating from a vehicle with multiple occupants does not give rise to reasonable articulable suspicion that the vehicle's occupants are armed and dangerous and subject to frisk."). Rather, the State argues that the totality of the circumstances surrounding the officers' encounter with Respondent justified the frisk

> i. *Officer Walden's primary basis for frisking Respondent was that the officers were outnumbered by Respondent and his companions*

Maryland courts have held that "[o]ne of the key requirements of reasonable suspicion, for either a stop or a frisk, is not only that it be present but that it *be actually articulated*." *Graham v. State*, 146 Md. App. 327, 359, 807 A.2d 75, 93 (2002) (emphasis added). Specifically, in the context of a frisk, we have explained that it is a

> *threshold requirement* that the frisking officer articulate his specific reasons for believing that the suspect was armed and dangerous. It is not enough that objective circumstances be present that might have permitted some other officer in some other case to conclude that the suspect was armed and dangerous. It is required that the frisking officer himself expressly articulate the specific reasons he had for believing that the frisk was necessary.

9

*Norman*, 452 Md. at 424, 156 A.3d at 970 (emphasis added) (quoting *Ames*, 231 Md. App. at 674, 153 A.3d at 906); *see also Graham*, 146 Md. App. at 359–60, 807 A.2d at 93 ("For a good frisk, it is not enough that in the abstract facts have been developed that might, objectively, permit some officer somewhere to conclude that the suspect or stopee was armed and dangerous. It is required that the frisking officer actually articulate the factors that lead to his reasonable suspicion that a frisk was necessary for his own protection.").

We also require that such an articulated basis to justify a *Terry* frisk be particularized to the individual circumstances at hand and cannot be a matter of a routine or a blanket policy. We have rejected authorizing frisks as a matter of routine policy where an officer lacks particularized reasonable suspicion that a suspect is armed and dangerous. In *Simpler*, we recognized that, "[w]hile there undoubtedly is some risk to the police in every confrontation, *Terry* has never been thought to authorize a protective frisk on the occasion of every authorized stop." 318 Md. at 321, 568 A.2d at 26. In that case, this Court rejected the constitutionality of an officer's frisk of individuals discovered drinking beer in the woods, where he claimed his frisk was done as "a matter of routine caution." *Id*. at 322, 568 A.2d at 27. Recently in *Sellman v. State*, we reaffirmed the holding in *Simpler* and rejected an officer's justification for a frisk of a suspect where the officer stated it was routine policy to frisk a suspect when they conducted a search of the suspect's automobile. 449 Md. 526, 537–38, 144 A.3d 771, 778 (2016).

In this case, the primary reason articulated by Officer Walden for searching Respondent and his companions was that they outnumbered the officers five to two, and it

was protocol to frisk for weapons when officers are outnumbered by suspects. He explained that in situations where officers are outnumbered:

> At first[,] you're in a terrible disadvantage. We were taught in the academy, it's basic, you'd want to also go with back-up and you shouldn't handle any call by yourself.

> But there are times where you're put in that position to where there are several people coming at you, so you have to get the advantage. And one of the first concerns is a weapon that they could use against you.

> And my first concern was one of them having a weapon. And there was five of them and they were right by a door where they could run out the door, plus the odor of CDS, the odor of marijuana, that there was illegal drug activity there, the fact that nobody could provide any identification that they live inside that building.

> So[,] the first thing we want to do is secure them and make sure they don't have any weapons on them. Once we found the weapon on them, then they were secured and handcuffed.

Officer Walden later reiterated that the first thing he does whenever he is outnumbered by suspects is search for weapons.

A blanket policy of always checking for weapons in circumstances where the officers are outnumbered by suspects is decidedly *not* a permissible basis for a *Terry* frisk under *Simpler* and *Sellman*. A *Terry* frisk must be supported by a *particularized* basis for suspecting that an individual is armed and dangerous. *See Thornton v. State*, 465 Md. 122, 143, 214 A.3d 34, 46 (2019) (holding that, when considering the constitutionality of a *Terry* frisk, "[t]he court must decide whether, under the circumstances, a reasonably prudent law enforcement officer would have felt that he [or she] was in danger, based on reasonable inferences from *particularized* facts in light of the officer's experience[]") (cleaned up) (emphasis added). Officer Walden's practice of always searching for weapons in cases

11

where he is outnumbered did not provide him with particularized suspicion that Respondent was armed and dangerous. I would hold that using this blanket policy as the primary basis for frisking Respondent renders the frisk unconstitutional under our Fourth Amendment standards.

ii. *Officer Walden did not have reasonable suspicion under the totality of the circumstances that Respondent was armed and dangerous*

Neither did the totality of the circumstances surrounding Officer Walden's encounter with Respondent reasonably justify a belief Respondent was armed and dangerous. When determining whether reasonable suspicion exists, "[t]he test is 'the totality of the circumstances,' viewed through the eyes of a reasonable, prudent, police officer." *Sellman*, 449 Md. at 542, 144 A.3d at 781 (2016) (quoting *Bost v. State*, 406 Md. 341, 356, 958 A.2d 356, 365 (2008)). As this Court recently stated in *Thornton*,

> [t]o articulate reasonable suspicion, an officer must explain how the observed conduct, when viewed in the context of all the other circumstances known to the officer, was indicative of criminal activity. [I]t is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation. Law enforcement officers cannot simply assert that innocent conduct was suspicious to him or her.

465 Md. at 147, 214 A.3d at 49 (internal citations and quotations omitted). In this case, when asked why he suspected that Respondent and his companions may have been armed, Officer Walden stated:

> One [reason] was the evasive body language. Another reason is because I just felt that because there's five of them in baggy clothes, they were being evasive, that for our safety to be able to continue with the investigation, that I wanted to feel safe that there was nobody that was armed at that time.

12

I begin with addressing Respondent's allegedly evasive behavior. Officer Walden described Respondent's behavior as follows:

> Four of the subjects sit to the stairs to the left and [Respondent] stayed on the top of the stairs to the right. And he was being evasive, because he was like man, I'm not doing nothing –

> *     *     *

> He's to the right of me and I told him to have a seat on top of the stairs. And he just kept facing away from me, he was sitting facing away from me. His body language, he just seemed to be evasive of what he was doing. Through my training and knowledge, I know that if you're being evasive in how you carry your body language, I mean that's a sign that you could be carrying a weapon.

> *     *     *

> So as I'm standing here, he's right there and he has a seat and he's just facing over here, so body language that I can't see anything, I can't really see his hands. He would speak to me, but I can't see his whole body language, I can't see what he's doing.

We have explained that we will not "'rubber stamp' conduct simply because the officer believed he had a right to engage in it" and that when an "officer seeks to justify a Fourth Amendment intrusion based on that conduct, the officer ordinarily must offer some explanation of why he or she regarded the conduct as suspicious; otherwise, there is no ability to review the officer's action." *Ransome v. State*, 373 Md. 99, 111, 816 A.2d 901, 908 (2003). "In other words, there must be an 'articulated logic to which this Court can defer.'" *Crosby*, 408 Md. at 509, 970 A.2d at 904 (quoting *United States v. Lester*, 148 F.Supp.2d 597, 607 (D. Md. 2001). In *Ransome*, we rejected a claim of reasonable suspicion that a suspect was armed and dangerous based on an observation that the suspect

13

had a bulge in his pocket, had stopped and looked at the unmarked police car as it approached, and when questioned by law enforcement, had ceased eye contact and acted nervously. *Ransome*, 373 Md. at 105, 816 A.2d at 904–05. We reasoned that the officer "never explained why he thought that petitioner's stopping to look at his unmarked car as it slowed down was suspicious or why petitioner's later nervousness or loss of eye contact, as two police officers accosted him on the street, was suspicious." *Id.* 109, 816 A.2d at 907.

Similar to the officer in *Ransome*, Officer Walden offered no explanation as to why Respondent's body language of sitting on a different part of the staircase from his companions and facing away from the officers was indicative that he might have been armed. Officer Walden simply testified he knew Respondent was being evasive based on his "training and knowledge," but failed to describe the training and knowledge or how it would be indicative that a suspect might be armed. As a result, we have no ability to review the officer's actions and can only "rubber stamp" his conclusion that Respondent's behavior was indicative of someone who was armed. Without any further explanation from Officer Walden, we could also conclude Respondent's body language was simply indicative of any teenager who was nervous, angry, or upset about being questioned by the police. Respondent was not the first person in his group searched, which suggests that the officers did not find Respondent's behavior particularly concerning. Instead, and consistent with Officer Walden's testimony, law enforcement searched the entire group as a matter of policy.

14

Officer Walden also referenced the fact Respondent was in "baggy clothes" among his considerations when developing reasonable suspicion that Respondent was armed. Specifically, he testified Respondent was wearing a "puffy jacket." The incident in question occurred in mid-November, when many Marylanders who are outside or about to walk outside will likely be found wearing puffy jackets to stay warm. Respondent and his companions similarly wore puffy jackets as they were about to walk outside; therefore this behavior should not have contributed to the officer's reasonable suspicious calculus. *Cf. United States v. Drayton,* 536 U.S. 194, 207, 122 S. Ct. 2105, 2114 (2002) (noting that it could have been relevant to a *Terry* stop and frisk analysis that the suspects were "dressed in heavy, baggy clothes *that were ill-suited for the day's warm temperatures*[.]") (emphasis added).

As recognized by the Third Circuit, "[t]here are limits, however, to how far police training and experience can go towards finding latent criminality in innocent acts." *Johnson v. Campbell*, 332 F.3d 199, 208 (3d Cir. 2003). In this case, the fact Respondent wore a bulky jacket, just as most people would wear in mid-November, should not be considered a contributing factor to the officer's reasonable suspicion that he was armed and dangerous. *See, e.g.*, *State v. Broadus,* 111 A.3d 57, 61–62 (N.H. 2015) (finding the fact that (1) the officer believed "that the defendant lied when she denied drinking alcohol in the vehicle; (2) she did not maintain eye contact with Locke; and (3) she wore baggy clothes[]" neither "alone or together, could have supported a reasonable suspicion that the defendant was armed and presently dangerous[]" and that "nothing about the defendant's 'attire alone could tell the officer[ ] anything about [her], except that [s]he liked to wear

15

baggy clothing.'") (quoting *State v. Miglavs*, 90 P.3d 607, 613 (Or. 2004)); *United States v. Job*, 871 F.3d 852, 861 (9th Cir. 2017) (finding "the facts that Job's pants appeared to be 'full of items' and he appeared nervous do not support the conclusion that he was engaged in criminal activity[]" warranting a *Terry* frisk).

The same is true of the officer's consideration that "there was five of them" as a part of his calculation Respondent could have been armed and dangerous. Like wearing a puffy jacket in November, there is nothing suspicious about travelling with a group of four other people, especially as young people. There is no reason to believe, nor did Officer Walden offer any reason to believe, that travelling with such a group might indicate a suspect being armed. As discussed above, a blanket policy of searching members of a group anytime an officer is outnumbered is not permissible under Maryland law, and Officer Walden offered no reason to believe that Respondent travelling in this particular group of five indicated he was armed and dangerous.

Finally, neither should the fact that the officers were responding to a call reporting possible trespass and marijuana use add to the reasonable suspicion calculus.[2] In *Sellman*, we explained:

---

[2] Although the Officer Walden did not mention the nature of the call when directly responding to the question about why he believed Respondent may have been armed, he did mention the nature of the call later when discussing the policy about frisking when outnumbered by suspects. Specifically, he stated:

> And my first concern was one of them having a weapon. And there was five of them and they were right by a door where they could run out the door, plus
>
> (continued . . .)

16

> *But for other types of crimes*, such as trafficking in small quantities of narcotics, *possession of marijuana*, illegal possession of liquor, prostitution, bookmaking, shoplifting and other theft, passing bad checks, underage drinking, driving under the influence and lesser traffic offenses, minor assault without weapons, curfew information, or vagrancy, as well as when the stop is for a legitimate noncriminal reason, or when the officer's duties otherwise necessitate his being in close proximity to the individual, *there must be, as Justice Harlan noted in Terry, "other circumstances" present.* Illustrative of the circumstances the courts have deemed sufficient are: the suspect's admission he is armed; a characteristic bulge in the suspect's clothing; an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed; movement under a jacket or shirt "consistent with the adjustment of a concealed firearm"; an otherwise inexplicable failure to remove a hand from a pocket; awkward movements manifesting an apparent effort to conceal something under his jacket; backing away by the suspect under circumstances suggesting he was moving back to give himself time and space to draw a weapon; awareness that the suspect had previously been engaged in serious criminal conduct (but not more ambiguous "record" information); awareness that the suspect had previously been armed; awareness of recent erratic and aggressive conduct by the suspect; discovery of a weapon in the suspect's possession; discovery that the suspect is wearing a bullet proof vest as to which he makes evasive denials; and awareness of circumstances which might prompt the suspect to take defense action because of a misunderstanding of the officer's authority or purpose.

449 Md. at 560–61, 144 A.3d at 792 (some emphasis added) (quoting WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.6(a) 855–62 (5th ed. 2012)). The investigation potential trespass and marijuana possession by teenagers surely falls into category of minor, non-violent crimes for which "other circumstances"

---

(. . . continued)

> the odor of CDS, the odor of marijuana, that there was illegal drug activity there, the fact that nobody could provide any identification that they live inside that building.

As such, I will still consider this a factor articulated by Officer Walden as one of his articulated bases for suspecting Respondent was armed and dangerous.

must be present in order for a police officer to "infer weapons use." *See id.* at 559–61, 144 A.3d at 791–92. While the examples of "other circumstances" listed in *Sellman* are certainly not exhaustive, none of the circumstances surrounding the officers' encounter with Respondent are analogous to the examples listed. Here, the officers did not say that Respondent was making furtive or awkward movements manifesting an effort to conceal a firearm, but just that he was not facing them, and they could not see his hands. Far from refusing to remove his hands from his jacket when requested, the officers never asked Respondent to make his hands visible or face them at all. As "other circumstances" were not present, the officers were not permitted to infer weapons use based on the nature of the crimes they were investigating.

The State mentions a few other circumstances it believes contributed to the officer's reasonable suspicion that Respondent was armed and dangerous, namely: Respondent's refusal to answer the officer's questions, and the fact that the officer recovered a BB gun from one of Respondent's companions. Although the officers certainly testified about these facts, they notably did not mention them as contributing factors to their determination that Respondent might have been armed. As discussed above, Maryland courts rely on the frisking officer's actual "articul[ation] [of] his specific reasons for believing that the suspect was armed and dangerous[]" and find it insufficient "that objective circumstances be present that might have permitted some other officer in some other case to conclude that the suspect was armed and dangerous." *Ames*, 231 Md. App. at 674, 153 A.3d at 906. Rather, it is "required that the frisking officer himself expressly articulate the specific reasons he had for believing that the frisk was necessary." *Id.*, 153 A.3d at 906. As such,

18

I would not consider factors that were not articulated by the officers as a part of their consideration for determining Respondent might have been armed and dangerous.

Even considering such factors, I conclude they still do not amount to reasonable suspicion that Respondent was armed and dangerous under the totality of the circumstances. First, pertaining to the fact Respondent refused to answer the officer's questions and said "[m]y dick" in response to the officers' questions about who lived in the building, Respondent was not obligated to respond to the officer's questions. *See Collins v. State*, 376 Md. 359, 368, 829 A.2d 992, 997 (2003) (explaining an individual detained and questioned during a *Terry* stop "is not obligated to respond . . . and, "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released."). The officers described the group as "snickering, laughing and very carefree[;]" they were uncooperative, but not aggressive or agitated. Respondent's response may have been indicative of his immaturity or desire to impress his friends, but it did not reasonably suggest that he was armed or dangerous.

Second, the recovery of the BB gun from one of Respondent's companions did not justify Officer Walden's frisk of Respondent. Recently, in *Lockard v. State*, the Court of Special Appeals rejected an officer's assertion "[i]f there's one weapon, there could be more[]" as a justification of the frisk of a suspect after a knife was observed in his pocket. 247 Md. App. 90, 98, 233 A.3d 228, 233 (2020). Additionally, we have stated that "to allow the reasonable, articulable suspicion standard to be satisfied based upon a person's status, rather than an individualized assessment of the circumstances, would undermine the purpose for requiring officers to justify their reasons for searching a *particular individual*."

19

*State v. Nieves*, 383 Md. 573, 597, 861 A.2d 62, 77 (2004) (emphasis added). As such, Respondent's status as a companion to an individual discovered to be carrying a handgun, is not sufficient to justify the officers' reasonable suspicion that he might also be armed and dangerous.[3]

The State relies on *El-Amin v. Commonwealth*, 607 S.E.2d 115 (Va. 2005), in which police investigated a report that a group of young black males was smoking marijuana on a particular street corner. *Id.* at 116. When the officers approached, one of the members of the group began walking away and when the officers requested that he stop and face them, and the individual instead reached for his waistband. The officers restrained the individual, who continued to attempt to reach for his waist band, and ultimately recovered a pellet gun from a search of his person. *Id.* The officers then conducted a frisk of the other members of the group, including the defendant who was found to be carrying a firearm. *Id.* In that case, the Virginia Court explicitly did not adopt a *per se* rule approving of the search of a companion of a person validly frisked[4] and found to be in possession of a weapon. *Id.* at 118. Rather, it determined the circumstances present in that case, including, the fact it was late at night and they were in a high-crime area, in addition to the discovery of the weapon and group activity. *Id.* at 119.

---

[3] It is also worth questioning whether possession of a BB gun would warrant characterizing Respondent's companion as armed and dangerous.

[4] In *El-Amin*, the Court found the search of the defendant's companion was clearly justified as the companion did not comply with the officer's commands to turn around and face him and began to reach for his waistband. 607 S.E.2d at 116. Although the issue is not directly before this Court, it is not evident from the record the search of Respondent's companion revealing the BB gun was likewise justified.

20

Unlike in *El-Amin*, there were no additional circumstances in this case that justified the officers' search of Respondent. All of the members of Respondent's group complied with the officers' commands that they sit on the stairs. The officers' encounter with the group occurred indoors around approximately 7 p.m. and there was not a suggestion they were in a high crime area. Furthermore, as discussed above, none of the other circumstances surrounding the encounter, considered individually or together, warranted reasonable suspicion Respondent might have been armed and dangerous. This Court has not adopted a *per se* rule approving a search based on status as a companion of someone from whom a weapon was recovered, and the recovery of the BB gun from Respondent's companion was not sufficient to warrant a frisk of Respondent.

## CONCLUSION

Considering the foregoing, I dissent and would affirm the Court of Special Appeals' holding that the gun recovered from Respondent should have been suppressed as the fruit of an unlawful search. The totality of the circumstances neither provided a reasonably articulable basis that Respondent was in unlawful possession of marijuana nor a reasonably particularized suspicion that Respondent was armed and dangerous.

Judge Raker has authorized me to state that she joins in this opinion.